**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

Case No. _____ 03-23223

CIV-LENARD

ROYAL CARIBBEAN CRUISES LTD,
CELEBRITY CRUISES INC., MILLENNIUM
INC., INFINITY INC., SUMMIT INC., and
CONSTELLATION INC.,

MAGISTRATE JUDGE
SIMONTON

     Plaintiffs,

v.

ROLLS-ROYCE PLC, ROLLS-ROYCE
NORTH AMERICAN HOLDINGS INC.,
ROLLS-ROYCE COMMERCIAL MARINE
INC., ROLLS-ROYCE AB, ALSTOM POWER
CONVERSION S.A., ALSTOM, INC.,
ALSTOM POWER CONVERSION INC.,
MARINE SERVICE PARTNERS, INC., and
ALSTOM MARINE US,

     Defendants.

_____/

## NOTICE OF REMOVAL

Pursuant to 9 U.S.C. § 205 and 28 U.S.C. §§ 1441(b) and 1446, defendants Rolls-Royce

plc, Rolls-Royce North American Holdings Inc., Rolls-Royce Commercial Marine Inc., Rolls-

Royce AB, ALSTOM Power Conversion SA,[1] ALSTOM, Inc., ALSTOM Power Conversion,

Inc., and Marine Service Partners, Inc. (collectively referred to herein as "Defendants"), hereby

remove this action from the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade

County, Florida, to this Court and state:

     1.     On or about August 7, 2003, plaintiffs Royal Caribbean Cruises Ltd., Celebrity

Cruises Inc., Millennium Inc., Infinity Inc., Summit Inc., and Constellation Inc. ("Plaintiffs"),



---

[1] ALSTOM Power Conversion SA joins in this Notice solely to preserve its right to arbitrate this dispute
raised by plaintiffs, and subject to and without waiving its privileges under French law.

commenced an action against Defendants in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (Case No. 03-18350 CA 2).

2.     This Notice of Removal is timely filed pursuant to the Convention on the Recognition of Foreign Arbitral Awards, codified at 9 U.S.C. §§ 201-208 (the "Convention"). Section 205 of the Convention expressly provides that an action arising under the Convention may be removed at any time prior to trial:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, <u>at any time before the trial thereof,</u> remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal.

(emphasis added). Thus, the 30-day limit contained in 28 U.S.C. § 1446(b) does <u>not</u> apply to this proceeding. *See, e.g., Bautista v. Star Cruises*, 2003 WL 22348825, at *1 (S.D. Fla. Oct. 14, 2003) (Seitz, J.) ("§ 205 of the Convention . . . allows a defendant to remove an action to federal district court before the start of trial when the dispute relates to an arbitration agreement . . . ."); *Sheinberg v. Princess Cruise Lines, Ltd.*, 269 F. Supp 2d. 1349, 1352 (S.D. Fla. 2003) (Marra, J.) ("[T]his Court concludes that given the plain language of 9 U.S.C. § 205 regarding removal at any time before trial, the thirty day time limit does not apply to removal under the Convention."). *See also Bautista* at 2003 WL 22348825 at *10 ("the Convention . . . is to be construed broadly in favor of removal").

3.     In compliance with 28 U.S.C. § 1446(a), copies of all process, pleadings, and orders served upon Defendants are attached hereto as Exhibit **A**.

4.     All Defendants join in this removal.[2]

---

[2]While Plaintiffs also named "ALSTOM Marine US" as a defendant, it is not a legal entity and thus not a proper defendant. Indeed, Plaintiffs filed a "no service" return with respect to "ALSTOM Marine US" with the state court, thereby confirming that such entity does not exist. In any event, all ALSTOM Defendants join in this Notice.

5.      Royal Caribbean Cruises Ltd. is a Liberian corporation with its principal place of business in Miami-Dade County, Florida, and the parent corporation of Celebrity Cruises Inc., Millennium Inc., Infinity Inc., Summit Inc., and Constellation Inc.

6.      Celebrity Cruises Inc. is a Liberian corporation with its principal place of business in Miami-Dade County, Florida, and the operator of the cruise ships owned by Millennium Inc., Infinity Inc., Summit Inc., and Constellation Inc.

7.      Millennium Inc. is a Liberian corporation that owns the cruise ship *Millennium* and which has its principal place of business on the *Millennium*. Therefore, the location of its principal place of business changes from time to time; however, upon information and belief, Millennium Inc.'s principal place of business—*i.e.*, the vessel—has been located from time to time in Florida.

8.      Infinity Inc. is a Liberian corporation that owns the cruise ship *Infinity* and which has its principal place of business on the *Infinity*. Therefore, the location of its principal place of business changes from time to time; however, upon information and belief, Infinity Inc.'s principal place of business—*i.e.*, the vessel—has been located from time to time in Florida.

9.      Summit Inc. is a Liberian corporation that owns the cruise ship *Summit* and which has its principal place of business on the *Summit*. Therefore, the location of its principal place of business changes from time to time; however, upon information and belief, Summit Inc.'s principal place of business—*i.e.*, the vessel—has been located from time to time in Florida.

10.     Constellation Inc. is a Liberian corporation that owns the cruise ship *Constellation* and which has its principal place of business on the *Constellation*. Therefore, the location of its principal place of business changes from time to time; however, upon information and belief, Constellation Inc.'s principal place of business—*i.e.*, the vessel—has been located from time to time in Florida.

11.    Rolls-Royce plc is a United Kingdom business entity with its principal place of business in the United Kingdom.

12.    Rolls-Royce AB is a Swedish business entity with its principal place of business in Sweden.

13.    Rolls-Royce North American Holdings Inc. is a Delaware corporation with its principal place of business in Virginia.

14.    Rolls-Royce Commercial Marine Inc. is a Delaware corporation with its principal place of business in Louisiana.

15.    ALSTOM Power Conversion SA is a French business entity with its principal place of business in France.

16.    ALSTOM, Inc., is a Delaware corporation with its principal place of business in Connecticut.

17.    ALSTOM Power Conversion, Inc., is a Delaware corporation with its principal place of business in Pennsylvania.

18.    Marine Service Partners, Inc., is a Delaware corporation with its principal place of business in Miami-Dade County, Florida.

19.    This dispute falls within the scope of six arbitration agreements, and thus is covered by the Convention. Each of the agreements requires arbitration of this dispute in Geneva, Switzerland, and Plaintiffs are bound by these agreements just as Defendants are entitled to rely upon the arbitration provisions contained therein.

20.    Removal is appropriate pursuant to 9 U.S.C. § 205 and 28 U.S.C. § 1441(b) because this action arises under the Convention and is thus a civil action over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1331. *See, e.g., Industrial Risk Insurers v.*

*M.A.N. Gutehoffnungshütte GmbH*, 141 F.3d 1434, 1440 (11th Cir. 1998) ("Chapter 2 . . . creates original subject-matter jurisdiction over any action arising under the Convention.").

21.   Defendants file herewith the Civil Cover Sheet and have made payment of the required filing fee. No previous application for the relief sought through this Notice has been made to this or any other court.[3]

22.   Upon the filing of this Notice of Removal, written notice of the filing will be given to the Plaintiffs' attorneys, as provided by law, and copies of this Notice will be filed with the Clerk of the Circuit Court, Eleventh Judicial Circuit in and for Miami-Dade County, Florida, pursuant to 28 U.S.C. § 1446.

WHEREFORE, for the foregoing reasons, Defendants pray that this cause proceed in its entirety in this Court as an action properly removed thereto.

Date: December 5, 2003.

Respectfully submitted,

**AKERMAN SENTERFITT**
Attorneys for the Rolls-Royce Defendants
One Southeast Third Avenue
28th Floor
Miami, FL 33131-1704
Phone: 305-374-5600
Fax:    305-374-5095

By:  _____
Stanley H. Wakshlag, Esq.
Florida Bar No.: 266264
E-mail: swakshlag@akerman.com
Anthony J. Cuva, Esq.
Florida Bar No. 896251
E-mail: acuva@akerman.com
Christopher S. Carver, Esq.
Florida Bar No.: 993580
E-mail: ccarver@akerman.com

**HUGHES HUBBARD & REED LLP**
Attorneys for the ALSTOM Defendants
201 South Biscayne Boulevard
25th Floor
Miami, FL, 33131-4332
Phone: 305-358-1666
Fax:    305-371-8759

By:  _____
Nicolas Swerdloff, Esq.
Florida Bar No.: 070416
E-mail: swerdlof@hugheshubbard.com
Lisa M. Pisciotta, Esq.
Florida Bar No.: 543111
E-mail: pisciott@hugheshubbard.com

---

[3] On December 4, 2003, Defendants filed a Petition to Compel Arbitration in this Court, pursuant to the Convention. The petition was assigned Case No. 03-23214-Civ-LENARD/Simonton.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing *Notice of Removal*

was served by U.S. mail this 5th day of December, 2003, on:

Gary E. Davidson, Esq.
Carlos O. Fernandez, Esq.
Fowler, Rodriguez, Kingsmill,
 Flint, Gray & Chalos, L.L.P.
Gables International Plaza
2655 LeJeune Road — Suite 805
Coral Gables, FL 33134
*Attorneys for the Royal Caribbean Plaintiffs*

                                                     _____
                                                     Attorney

# EXHIBIT A

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT COURT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.  03-18350 CA 2

ROYAL CARIBBEAN CRUISES LTD.;
CELEBRITY CRUISES INC.; MILLENNIUM
INC.; INFINITY INC.; SUMMIT INC.; and
CONSTELLATION INC.

      Plaintiffs,

vs.

ROLLS ROYCE, PLC; ROLLS ROYCE
NORTH AMERICAN HOLDINGS, INC.;
ROLLS ROYCE COMMERCIAL MARINE,
INC.; ROLLS ROYCE, AB;
ALSTOM POWER CONVERSION, S.A.;
ALSTOM, INC.; ALSTOM POWER
CONVERSION, INC.; MARINE SERVICE
PARTNERS, INC. and ALSTOM MARINE US

      Defendants.

JOSEFINA MOGOLLON

_____

**SUMMONS**

STATE OF FLORIDA
Each Sheriff Of The State:

      YOU ARE COMMANDED to serve this summons and a copy of the Complaint in this

action on Defendant:

**ROLLS ROYCE PLC**
**by and through its Agent, Rolls Royce Commercial Marine, Inc.,**
**by and through its Registered Agent,**
**Corporation Service Company**
**1201 Hays Street**
**Tallahassee, Florida  32301-2525**

CASE NO. 03-18350 CA 2
Page 2

Each Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney whose name,

address and phone number is: Gary E. Davidson, Esq., FOWLER RODRIGUEZ & CHALOS, Gables International

Plaza, 2655 LeJeune Road, Suite 805, Coral Gables, FL, 33134, (305) 445-2930, **within _20_ days after**

**service of the Summons on the Defendant**, exclusive of the day of service, and to file the original of the

defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter.

If Defendant fails to do so, a default will be entered against Defendant for the relief demanded in the

Complaint.

Gary E. Davidson, Esq.
Florida Bar No. 69094
FOWLER RODRIGUEZ & CHALOS
Attorneys for Plaintiff
Gables International Plaza
2655 Le Jeune Road, Suite 805
Coral Gables, FL 33134
(305) 445-2930 – Telephone
(305) 445-2450 – Facsimile

DATED: August **SEP 2 6 2003** _____, 2003

Harvey Ruvin
As Clerk of the Court

By: _____
As Deputy Clerk

## SUMMONS

### IMPORTANT

A lawsuit has been filed against you. You have _20_ calendar days after this summons
is served on you to file a written response to the attached complaint with the clerk of this court. A
phone call will not protect you. Your written response, including the case number given above and
the names of the parties, must be filed if you want the court to hear your side of the case. If you do
not file your response on time, you may lose the case, and your wages, money, and property may
thereafter be taken without further warning from the court. There are other legal requirements. You
may want to call an attorney right away. If you do not know an attorney, you may call an attorney
referral service or a legal aid office (listed in the phone book).

CASE NO. 03-18350 CA 2
Page 3

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named above.

IMPORTANTE

Usted ha sido demamdado legalmente.-Tiene **_20_** dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez **_20_** jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de cetribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'um avocat. Si vous ne connaissez pas d'avocar, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT COURT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 03-18350 CA 2

ROYAL CARIBBEAN CRUISES LTD.;
CELEBRITY CRUISES INC.; MILLENNIUM
INC.; INFINITY INC.; SUMMIT INC.; and
CONSTELLATION INC.

       Plaintiffs,

vs.

ROLLS ROYCE, PLC; ROLLS ROYCE
NORTH AMERICAN HOLDINGS, INC.;
ROLLS ROYCE COMMERCIAL MARINE,
INC.; ROLLS ROYCE, AB;
ALSTOM POWER CONVERSION, S.A.;
ALSTOM, INC.; ALSTOM POWER
CONVERSION, INC.; MARINE SERVICE
PARTNERS, INC. and ALSTOM MARINE US

       Defendants.

_____/

## <u>SUMMONS</u>

THE STATE OF FLORIDA
To Each Sheriff Of The State:

       YOU ARE COMMANDED to serve this summons and a copy of the Complaint in this

action on Defendant:

**ROLLS ROYCE NORTH AMERICAN HOLDINGS, INC.**
 **Suite 100**
**14850 Conference Center Dr.**
**Chantilly, Virginia   20151**

Each Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney whose name,

address and phone number is: Gary E. Davidson, Esq., FOWLER RODRIGUEZ & CHALOS, Gables International

CASE NO. 03-18350 CA 2
Page 2

Plaza, 2655 LeJeune Road, Suite 805, Coral Gables, FL, 33134, (305) 445-2930, within _*20*_ days after

service of the Summons on the Defendant, exclusive of the day of service, and to file the original of the

defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter.

If Defendant fails to do so, a default will be entered against Defendant for the relief demanded in the

Complaint.

**AUG 2 5 2003**

Gary E. Davidson, Esq.                          DATED: August _____, 2003
Florida Bar No. 69094
FOWLER RODRIGUEZ & CHALOS
Attorneys for Plaintiff
Gables International Plaza
2655 Le Jeune Road, Suite 805                   Harvey Ruvin
Coral Gables, FL 33134                          As Clerk of the Court
(305) 445-2930 – Telephone
(305) 445-2450 – Facsimile

**CHARON SANDS**

By: _____
                                As Deputy Clerk

## SUMMONS

### IMPORTANT

    A lawsuit has been filed against you. You have _*20*_ calendar days after this summons
is served on you to file a written response to the attached complaint with the clerk of this court. A
phone call will not protect you. Your written response, including the case number given above and
the names of the parties, must be filed if you want the court to hear your side of the case. If you do
not file your response on time, you may lose the case, and your wages, money, and property may
thereafter be taken without further warning from the court. There are other legal requirements. You
may want to call an attorney right away. If you do not know an attorney, you may call an attorney
referral service or a legal aid office (listed in the phone book).

    If you choose to file a written response yourself, at the same time you file your written
response to the court you must also mail or take a copy of your written response to the
"Plaintiff/Plaintiff's Attorney" named above.

CASE NO. 03-18350 CA 2
Page 3

## IMPORTANTE

Usted ha sido demamdado legalmente. Tiene _20_ dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez_20_ jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de cetribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'um avocat. Si vous ne connaissez pas d'avocar, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT COURT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.  03-18350 CA 2

ROYAL CARIBBEAN CRUISES LTD.;
CELEBRITY CRUISES INC.; MILLENNIUM
INC.; INFINITY INC.; SUMMIT INC.; and
CONSTELLATION INC.

      Plaintiffs,

vs.

ROLLS ROYCE, PLC; ROLLS ROYCE
NORTH AMERICAN HOLDINGS, INC.;
ROLLS ROYCE COMMERCIAL MARINE,
INC.; ROLLS ROYCE, AB;
ALSTOM POWER CONVERSION, S.A.;
ALSTOM, INC.; ALSTOM POWER
CONVERSION, INC.; MARINE SERVICE
PARTNERS, INC. and ALSTOM MARINE US

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA
To Each Sheriff Of The State:

      YOU ARE COMMANDED to serve this summons and a copy of the Complaint in this

action on Defendant:

**SERVE** → **ROLLS ROYCE COMMERCIAL MARINE, INC.**
         **14850 Conference Center Dr.**
         **Chantilly, Virginia   20151**

Each Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney whose name,

address and phone number is: Gary E. Davidson, Esq., FOWLER RODRIGUEZ & CHALOS, Gables International

Plaza, 2655 LeJeune Road, Suite 805, Coral Gables, FL, 33134, (305) 445-2930, **within** _20_ **days after**

CASE NO. 03-18350 CA 2
Page 2

**service of the Summons on the Defendant**, exclusive of the day of service, and to file the original of the

defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter.

If Defendant fails to do so, a default will be entered against Defendant for the relief demanded in the

Complaint.

Gary E. Davidson, Esq.
Florida Bar No. 69094
FOWLER RODRIGUEZ & CHALOS
Attorneys for Plaintiff
Gables International Plaza
2655 Le Jeune Road, Suite 805
Coral Gables, FL 33134
(305) 445-2930 – Telephone
(305) 445-2450 – Facsimile

DATED: August _____, 2003
AUG 2 5 2003

Harvey Ruvin
As Clerk of the Court

By: _____**CHARON SANDS**_____
As Deputy Clerk

## SUMMONS

### IMPORTANT

A lawsuit has been filed against you. You have __*20*__ calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named above.

CASE NO. 03-18350 CA 2
Page 3

## IMPORTANTE

Usted ha sido demamdado legalmente. Tiene _20_ dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nómbres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez _20_ jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de cetribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'um avocat. Si vous ne connaissez pas d'avocar, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT COURT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.  03-18350 CA 2

JOSEFINA MOGOLLON

ROYAL CARIBBEAN CRUISES LTD.;
CELEBRITY CRUISES INC.; MILLENNIUM
INC.; INFINITY INC.; SUMMIT INC.; and
CONSTELLATION INC.

      Plaintiffs,

vs.

ROLLS ROYCE, PLC; ROLLS ROYCE
NORTH AMERICAN HOLDINGS, INC.;
ROLLS ROYCE COMMERCIAL MARINE,
INC.; ROLLS ROYCE, AB;
ALSTOM POWER CONVERSION, S.A.;
ALSTOM, INC.; ALSTOM POWER
CONVERSION, INC.; MARINE SERVICE
PARTNERS, INC. and ALSTOM MARINE US

      Defendants.

_____

## SUMMONS

THE STATE OF FLORIDA
To Each Sheriff Of The State:

      YOU ARE COMMANDED to serve this summons and a copy of the Complaint in this

action on Defendant:

**ROLLS ROYCE AB**
**by and through its Agent, Rolls Royce Commercial Marine, Inc.,**
**by and through its Registered Agent,**
**Corporation Service Company**
**1201 Hays Street**
**Tallahassee, Florida   32301-2525**

1472910

CASE NO. 03-18350 CA 2
Page 2

Each Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney whose name,

address and phone number is: Gary E. Davidson, Esq., FOWLER RODRIGUEZ & CHALOS, Gables International

Plaza, 2655 LeJeune Road, Suite 805, Coral Gables, FL, 33134, (305) 445-2930, **within** *20* **days after**

**service of the Summons on the Defendant**, exclusive of the day of service, and to file the original of the

defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter.

If Defendant fails to do so, a default will be entered against Defendant for the relief demanded in the

Complaint.

SEP 2 6 2003

DATED: August _____, 2003

Gary E. Davidson, Esq.
Florida Bar No. 69094
FOWLER RODRIGUEZ & CHALOS
Attorneys for Plaintiff
Gables International Plaza
2655 Le Jeune Road, Suite 805
Coral Gables, FL 33134
(305) 445-2930 – Telephone
(305) 445-2450 – Facsimile

Harvey Ruvin
As Clerk of the Court

By: _____
As Deputy Clerk

## SUMMONS

### IMPORTANT

A lawsuit has been filed against you. You have *20* calendar days after this summons
is served on you to file a written response to the attached complaint with the clerk of this court. A
phone call will not protect you. Your written response, including the case number given above and
the names of the parties, must be filed if you want the court to hear your side of the case. If you do
not file your response on time, you may lose the case, and your wages, money, and property may
thereafter be taken without further warning from the court. There are other legal requirements. You
may want to call an attorney right away. If you do not know an attorney, you may call an attorney
referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named above.

## IMPORTANTE

Usted ha sido demamdado legalmente. Tiene *10* dias, contados a partir del recibo de esta notificación, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez *20* jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de cetribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'um avocat. Si vous ne connaissez pas d'avocar, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT COURT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.  03-18350 CA 2

ROYAL CARIBBEAN CRUISES LTD.;
CELEBRITY CRUISES INC.; MILLENNIUM
INC.; INFINITY INC.; SUMMIT INC.; and
CONSTELLATION INC.

       Plaintiffs,

vs.

ROLLS ROYCE, PLC; ROLLS ROYCE
NORTH AMERICAN HOLDINGS, INC.;
ROLLS ROYCE COMMERCIAL MARINE,
INC.; ROLLS ROYCE, AB;
ALSTOM POWER CONVERSION, S.A.;
ALSTOM, INC.; ALSTOM POWER
CONVERSION, INC.; MARINE SERVICE
PARTNERS, INC. and ALSTOM MARINE US

       Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA
To Each Sheriff Of The State:

      YOU ARE COMMANDED to serve this summons and a copy of the Complaint in this

action on Defendant:

**ALSTOM, INC.**
**2000 Day Hill Road**
**Windsor, Connecticut   06095**

Each Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney whose name,

address and phone number is: Gary E. Davidson, Esq., FOWLER RODRIGUEZ & CHALOS, Gables International

Plaza, 2655 LeJeune Road, Suite 805, Coral Gables, FL, 33134, (305) 445-2930, **within 20 days after**

CASE NO. 03-18350 CA 2
Page 2

**service of the Summons on the Defendant,** exclusive of the day of service, and to file the original of the

defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter.

If Defendant fails to do so, a default will be entered against Defendant for the relief demanded in the

Complaint.

AUG 2 5 2003

Gary E. Davidson, Esq.                                         DATED: August _____, 2003
Florida Bar No. 69094
FOWLER RODRIGUEZ & CHALOS
Attorneys for Plaintiff
Gables International Plaza
2655 Le Jeune Road, Suite 805                                 Harvey Ruvin
Coral Gables, FL 33134                                        As Clerk of the Court
(305) 445-2930 – Telephone
(305) 445-2450 – Facsimile

CHARON SANDS

By: _____
                                                                As Deputy Clerk

## SUMMONS

### IMPORTANT

A lawsuit has been filed against you. You have __20__ calendar days after this summons
is served on you to file a written response to the attached complaint with the clerk of this
court. A phone call will not protect you. Your written response, including the case number given above and
the names of the parties, must be filed if you want the court to hear your side of the case. If you do
not file your response on time, you may lose the case, and your wages, money, and property may
thereafter be taken without further warning from the court. There are other legal requirements. You
may want to call an attorney right away. If you do not know an attorney, you may call an attorney
referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written
response to the court you must also mail or take a copy of your written response to the
"Plaintiff/Plaintiff's Attorney" named above.

CASE NO. 03-18350 CA 2
Page 3

### IMPORTANTE

Usted ha sido demamdado legalmente. Tiene _20_ dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa; debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

### IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez _20_ jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de cetribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'um avocat. Si vous ne connaissez pas d'avocar, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme cidessous.

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT COURT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 03-18350 CA 2

ROYAL CARIBBEAN CRUISES LTD.;
CELEBRITY CRUISES INC.; MILLENNIUM
INC.; INFINITY INC.; SUMMIT INC.; and
CONSTELLATION INC.

      Plaintiffs,

vs.

ROLLS ROYCE, PLC; ROLLS ROYCE
NORTH AMERICAN HOLDINGS, INC.;
ROLLS ROYCE COMMERCIAL MARINE,
INC.; ROLLS ROYCE, AB;
ALSTOM POWER CONVERSION, S.A.;
ALSTOM, INC.; ALSTOM POWER
CONVERSION, INC.; MARINE SERVICE
PARTNERS, INC. and ALSTOM MARINE US

      Defendants.

_____/

## SUMMONS

THE STATE OF FLORIDA
To Each Sheriff Of The State:

      YOU ARE COMMANDED to serve this summons and a copy of the Complaint in this

action on Defendant:

              **MARINE SERVICE PARTNERS, INC.**
              **through its Registered Agent**
              **CT Corporation System**
              **1200 South Pine Island Road**
              **Plantation, Florida  33324**

Each Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney whose name,

address and phone number is: Gary E. Davidson, Esq., FOWLER RODRIGUEZ & CHALOS, Gables International

CASE NO. 03-18350 CA 2
Page 2

Plaza, 2655 LeJeune Road, Suite 805, Coral Gables, FL, 33134, (305) 445-2930, within _20_ days after service of the Summons on the Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If Defendant fails to do so, a default will be entered against Defendant for the relief demanded in the Complaint.

Gary E. Davidson, Esq.
Florida Bar No. 69094
FOWLER RODRIGUEZ & CHALOS
Attorneys for Plaintiff
Gables International Plaza
2655 Le Jeune Road, Suite 805
Coral Gables, FL 33134
(305) 445-2930 - Telephone
(305) 445-2450 – Facsimile

DATED: August **AUG 2 5 2003**, 2003

Harvey Ruvin
As Clerk of the Court

By: _____
As Deputy Clerk

## SUMMONS

### IMPORTANT

A lawsuit has been filed against you. You have _20_ calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named above.

# RETURN OF SERVICE

Case No: 03-18350 CA 2

| TO BE SERVED | COURT |
|---|---|
| MARINE SERVICE PARTNERS, INC.<br>1200 SOUTH PINE ISLAND ROAD<br>PLANTATION. FL. | IN THE COUNTY COURT, IN AND FOR DADE COUNTY,<br>FLORIDA |

| STYLE | WRIT |
|---|---|
| ROYAL CARIBBEAN CRUISES LTD.<br>VS<br>ROLLS ROYCE. PLC | SUMMONS (GJ) |

| SERVED FOR | INFORMATION |
|---|---|
| GARY E. DAVIDSON, ESQUIRE<br>2655 LeJEUNE RD.<br>SUITE 805<br><br>CORAL GABLES, , FLORIDA. 33134 | Court Date:                    Court Time:<br>Witness Fee:<br>Document Type:  Original<br>Atty File # |

I received this process 08/25/03 at  3:32 PM and it was served 08/26/03 at  1:10 PM in BROWARD COUNTY, FLORIDA.

        MARINE SERVICE PARTNERS, INC.
        1200 SOUTH PINE ISLAND ROAD
        PLANTATION, FL., 33324

**CORPORATE REGISTERED AGENT: (FS 48.091)**

By serving a copy of this SUMMONS  (GJ) and a copy of the complaint, petition or initial pleading on:
CT CORPORATION as registered agent of defendant corporation.

**OTHER RETURNS:**

BY SERVING ANNE BOUTILIER

Under penalty of perjury, I declare that I have read the foregoing and that the facts stated in it are true, that I am a Certified Process Server/Sheriff Appointed in the circuit in which this defendant was served and have no interest in the above action persuant to F.S. 92.525(2).

I hereby certify that I am not a party to the above action, am over 18 years of age, that the above affidavit is true and correct, and that service was made in accordance with Rule 1.410(C) Florida R.C.P., and Rule 45 Federal R.C.P., and Rule 4(C), 50 U.S.C., and section 520 Et. Seq.

The foregoing instrument was acknowledged before me this 29 day of August, 2003 BY VICTOR F. RACEK, who is personally known to me, or who was produced a D/L as identification and who DID take an oath.

PROCESS SERVER: VICTOR F. RACEK (25)
CAPLAN, CAPLAN AND KAYE (305) 374-3426
CPS Number: 0107243 1-001

NOTARY PUBLIC OR PUBLIC OFFICER
AND TITLE OR RANK / CCN



**T. LIGGETT**
**AUG 27 2003**



## CT System

**Service of Process Transmittal Form**
Plantation, Florida

**08/26/2003**

**Via Federal Express (2nd Day)**

TO:  Thomas E Liggett General Counsel
Alstom Power Inc.
2000 Day Hill Road
Windsor, CT 06095

RE:    **PROCESS SERVED IN FLORIDA**

FOR    Marine Service Partners Inc. Domestic State: De

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

1. TITLE OF ACTION:    Royal Caribbean Cruises Ltd, et al, Pltfs. vs Rolls Royce, PLC, et al including Marine Service Partners, Inc., Dfts.

2. DOCUMENT(S) SERVED:    Summons, Complaint, Exhibits

3. COURT:    Miami-Dade County Circuit Court, FL
Case Number 03-18350-CA-2

4. NATURE OF ACTION:    Deceptive and unfair trade practices; fraud in the inducement into the purchase and continued use of certain Mermaid Pod Propulsion System which is defective resulting in damages

5. ON WHOM PROCESS WAS SERVED:    CT Corporation System, Plantation, Florida

6. DATE AND HOUR OF SERVICE:    By Process server on 08/26/2003 at 01:10

7. APPEARANCE OR ANSWER DUE:    Within 20 days

8. ATTORNEY(S):    Gary E. Davidson
(305) 445-2930
Gables International Plaza
2655 LeJeune Road, Suite 805
Coral Gables, FL 33134

9. REMARKS:    Trial by jury demanded.

SIGNED    CT Corporation System

PER    Anne Boutilier /TB
ADDRESS    1200 South Pine Island Road
Plantation, FL 33324
SOP WS 0005647673

Information contained on this transmittal form is recorded for C T Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

ROYAL CARIBBEAN CRUISES LTD;
CELEBRITY CRUISES INC.; MILLENNIUM
INC.; INFINITY INC.; SUMMIT INC.; and
CONSTELLATION INC.,

CASE NO.:   03=18350   *CA 2*

     Plaintiffs,

vs.

ROLLS ROYCE, PLC; ROLLS ROYCE
NORTH AMERICAN HOLDINGS, INC.;
ROLLS ROYCE COMMERCIAL MARINE,
INC.; ROLLS ROYCE, AB;
ALSTOM POWER CONVERSION, S.A.;
ALSTOM, INC.; ALSTOM POWER
CONVERSION, INC.; MARINE SERVICE
PARTNERS, INC.; and ALSTOM MARINE
US,



     Defendants.

_____/

## COMPLAINT FOR DAMAGES

     Plaintiffs, Royal Caribbean Cruises Ltd. ("RCL"); Celebrity Cruises Inc. ("Celebrity");

Millennium Inc. ("Millennium"); Infinity Inc. ("Infinity"); Summit Inc. ("Summit"); and

Constellation Inc. ("Constellation") (collectively referred to at times herein as "Royal Caribbean"),

sue Defendants, Rolls Royce, PLC ("RRPLC"); Rolls Royce North American Holdings, Inc.

("RRNA"); Rolls Royce Commercial Marine, Inc. ("RRCM"); and Rolls Royce, AB ("RRAB")

(collectively referred to at times herein as "Rolls Royce"); Alstom Power Conversion, S.A. ("APC,

*Royal Caribbean, et al.  v. Rolls Royce PLC, et al.*
Page 2

SA"); Alstom, Inc. ("AI"); Alstom Power Conversion, Inc. ("APC, Inc."); Marine Service Partners,

Inc. ("MSP"); Alstom Marine US ("AMUS") (collectively referred to at times herein as "Alstom"),

and state as follows:

### Jurisdiction, Venue and Parties

1.      This is an action for damages in excess of the minimum jurisdictional requirements

of this Court and this Court has jurisdiction to hear the state law and maritime law claims asserted

herein. Each of the Defendants has caused harm to each of the Plaintiffs in an amount in excess of

Fifteen Thousand ($15,000.00) Dollars.

2.      Venue is proper in Miami-Dade County, Florida because one or more of the causes

of action alleged in this complaint accrued in this county and one or more Defendants resides in

Miami-Dade County.

3.      Plaintiff RCL is a Liberian corporation authorized to do business in Florida and

having its principal place of business in Miami-Dade County, Florida. RCL is in the cruise ship

industry and supplies services to the Millennium Class cruise ships MILLENNIUM, INFINITY,

SUMMIT and CONSTELLATION. RCL is also the parent corporation of Celebrity, Millennium,

Infinity, Summit, and Constellation.

4.      Plaintiff Celebrity is a Liberian corporation authorized to do business in Florida and

having its principal place of business in Miami-Dade County, Florida. Celebrity is in the cruise ship

industry and is the operator of the Millennium Class cruise ships MILLENNIUM, INFINITY,

SUMMIT and CONSTELLATION.

*Royal Caribbean, et al.  v. Rolls Royce PLC, et al.*
Page 3

5.     Plaintiff Millennium is a Liberian corporation.  Millennium is the owner of the cruise ship MILLENNIUM.

6.     Plaintiff Infinity is a Liberian corporation.  Infinity is the owner of the cruise ship INFINITY.

7.     Plaintiff Summit is a Liberian corporation.  Summit is the owner of the cruise ship SUMMIT.

8.     Plaintiff Constellation is a Liberian corporation.  Constellation is the owner of the cruise ship CONSTELLATION.

9.     Defendant RRPLC is a British business entity with its principal place of business in England.  Upon information and belief, RRPLC has conducted, and now conducts, business in the State of Florida, has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*, and is knowledgeable of the relevant aspects of the cruise line industry.

10.    Defendant RRNA is a Delaware corporation with its principal place of business in Chantilly, Virginia.   Upon information and belief, RRNA has conducted, and now conducts, business in the State of Florida, has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*, and is knowledgeable of the relevant aspects of the cruise line industry.

11.    Defendant RRCM is a Delaware corporation with its principal place of business in Chantilly, Virginia, and its registered agent for service of process in Tallahassee, Florida. Upon information and belief, RRCM has conducted, and now conducts, business in the State of Florida, has caused harm to the Plaintiffs here in Florida, all as is more fully set forth     *infra*, and is knowledgeable of the relevant aspects of the cruise line industry.

12. Defendant RRAB is a Swedish business entity with its principal place of business in Kristenehamn, Sweden. RRAB formerly was known as Kamewa AB. Upon information and belief, RRAB has conducted, and now conducts, business in the State of Florida, has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*, and is knowledgeable of the relevant aspects of the cruise line industry.

13. Defendant APC, SA is a French business entity with its principal place of business in Belfort, France. Upon information and belief, APC, SA has conducted, and now conducts, business in the State of Florida, has caused harm to the Plaintiffs here in Florida, all is as more fully set forth *infra*, and is knowledgeable of the relevant aspects of the cruise line industry.

14. Defendant AI is a Delaware corporation with its principal place of business in Windsor, Connecticut. Upon information and belief, AI has conducted, and now conducts, business in the State of Florida, has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*, and is knowledgeable of the relevant aspects of the cruise line industry.

15. Defendant APC, Inc. is a Delaware corporation with its principal place of business in Pittsburgh, Pennsylvania. Upon information and belief, APC has conducted, and now conducts, business in the State of Florida, has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*, and is knowledgeable of the relevant aspects of the cruise line industry.

16. Defendant MSP is a Delaware corporation with its principal place of business in Miami, Florida. Upon information and belief, MSP has conducted, and now conducts, business in the State of Florida, has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*, and is knowledgeable of the relevant aspects of the cruise line industry.

17.    Defendant AMUS is a foreign corporation with its principal place of business in Miami, Florida.  Upon information and belief, AMUS has conducted, and now conducts, business in the State of Florida, has caused harm to the Plaintiffs here in Florida, all as is more fully set forth *infra*, and is knowledgeable of the relevant aspects of the cruise line industry.

18.    Pursuant to Fla. Stat. §48.193(1) and (2), each of the named Defendants has subjected itself to jurisdiction in the courts of Florida by virtue of engaging in substantial and not isolated activities within this state; operating, conducting, engaging in, and/or carrying on a business or business venture in this state; having an office or agency in this state; committing a tortious act within this state; and/or by breaching warranties in this state by failing to perform acts required by warranties to be performed in this state.  The Defendants' tortious and other actionable conduct described herein was specifically directed to, performed in, relied upon, and caused significant damage to Royal Caribbean in Miami-Dade County, Florida.

19.    Upon information and belief, at all times material hereto, the foreign Alstom Defendants acted through their Florida subsidiaries, which exist merely as a conduit for the purpose of doing the business of the foreign entities and have acted as the agents of the foreign entities in dealings with Royal Caribbean.

20.    Upon information and belief, the Rolls Royce Defendants are merely alter egos of one another.  Upon information and belief, at all times material hereto, all Rolls Royce Defendants acted as a single corporate entity, disregarding corporate distinctions, failing to observe corporate formalities, sharing common ownership and directorships, and comingling funds.  Upon information and belief, at all times material hereto, the foreign Rolls Royce Defendants acted through their

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 6

Florida subsidiaries, which exist merely as a conduit for the purpose of doing the business of the foreign entities and have acted as the agents of the foreign entities in dealings with Royal Caribbean. Accordingly, the corporate distinctions between the Rolls Royce Defendants should be disregarded by the Court, and the Rolls Royce Defendants should be considered as one legal entity.

21.   All conditions precedent to the filing of this action have occurred, been performed or waived.

## General Allegations

### Nature of the Action

22.   This Complaint is made by Royal Caribbean, one of the premier cruise line companies in the world, for damages it has suffered as a result of the Defendants having defrauded and deceived Royal Caribbean into the purchase and continued use of a propulsion system for four of its newest and best cruise ships, the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION. This propulsion system was marketed by the Defendants as the Mermaid pod propulsion system (hereinafter the "Mermaid"). It was touted by the Defendants as the best pod in the industry and also as a proven, well tested product. These representations were false. The Mermaid turned out to be a defectively designed and built product which was in fact at an experimental stage of its development when it was installed in the four cruise ships. From the beginning, the Mermaids on the cruise ships experienced serious problems causing repeated interruption of Royal Caribbean's services to its valued passengers. The Defendants claimed, as each problem arose, that each was an isolated incident, that they had carefully studied the problem, and that they could fix the problem so it would not occur again. After repeated failures, this also turned out to be false. When Royal

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 7

Caribbean suggested that perhaps there must be an inherent problem with the Mermaid, this was

vigorously denied by the Defendants. This too was false; Mermaid problems have continued to date.

The latest Mermaid problems occurred as recently as July 12, 2003 on the MILLENNIUM. It is now

crystal clear that the Mermaids simply do not function as they should, and that they are susceptible

to multiple failures. Most importantly, it is now also clear that the Defendants have known about this

situation all along and that they have deliberately conspired to mislead, deceive and defraud Royal

Caribbean into believing otherwise. The Defendants either do not know how to fix the Mermaids,

or they do not want to spend the money to redesign the Mermaids and/or replace them. As a result,

Royal Caribbean has sustained damages presently estimated to be in excess of 300 million dollars

(and growing) due to the costs of repairs and maintenance, unscheduled interruptions of operations,

interrupted or cancelled voyages, emergency transportation and housing of passengers, loss of

goodwill with passengers, damage to its relationships with travel agents, loss of reputation in the

industry, loss of reputation and goodwill with its customer base, and the resulting lost past and future

profits. This lawsuit brings causes of action pursuant to the laws of Florida and the general

maritime law for: breach of express warranties; breach of implied warranty of fitness for a particular

purpose; breach of implied warranty of merchantability; negligent misrepresentation; fraud in the

inducement; fraud; fraudulent misrepresentation; deceptive and unfair trade practices; negligent

testing, inspecting, repairing, and/or servicing; breach of warranty of workmanlike performance;

negligent professional services; false, misleading and deceptive advertising and sales; and tortious

interference with advantageous business relationships; and conspiracy.

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 8

### RCL and the Millennium Class Cruise Ships: A Commitment to Excellence

23.    RCL is one of the world's largest cruise companies, operating the Royal Caribbean International and Celebrity Cruises brands, with 25 modern cruise ships and a passenger capacity of approximately 53,000.  On any given day, three hundred and sixty five days per year, RCL is dedicated to providing approximately 53,000 guests with the highest quality cruise vacation experience available.

24.    RCL has, for over thirty years, built its business reputation on an unwavering commitment to delivering its passengers the highest quality service and best cruise vacation experience possible. Celebrity was established as an upscale cruise line to strategically target consumers seeking an enhanced, premium cruise vacation, while also attracting experienced cruisers from the contemporary and luxury cruise category.

25.    Repeat passengers, those who return to RCL for their cruise experience after their initial voyage, constitute a significant portion of RCL's business.  Accordingly, RCL is passionately committed to consistently deliver to its customers the best vacation experience available on land or sea.

26.    In order to fulfill this commitment to its passengers, RCL has invested heavily in its fleet of modern, state of the art cruise ships featuring the highest quality technology available.

27.    A significant portion of RCL's customers are referred to RCL through travel agents who book vacations with RCL for their customers.  Accordingly, RCL has invested in developing positive relationships with travel agents throughout the world who have come to depend upon RCL

to consistently deliver a superior cruise vacation experience to their customers. The goodwill enjoyed by RCL from travel agents who book vacations with RCL for their customers is one of RCL's most important assets.

28.     In the late 1990's, RCL embarked on a program to build a fleet of cruise ships to form the flagship fleet of its Celebrity Cruises brand. The fleet was to be called the Millennium Class of cruise ships.

29.     Celebrity was founded in 1989 as an upscale cruise line to establish a new level of "premium" cruising. Celebrity identified its potential customer base as quality buyers who were well-informed about products and services, who considered their purchasing decisions carefully, and who regarded quality and value as the essential criteria of their vacation choices. In short, Celebrity chose to service a clientele that demanded excellence, and Celebrity dedicated itself to delivering excellence in every aspect of its cruise experience. Accordingly, the quality of the performance of Celebrity's flagship fleet was a critical consideration. RCL wanted the Millennium Class of cruise ships to reflect the company's passionate dedication to excellence and commitment to quality. The Millennium Class was designed to set a new and extraordinary standard in the cruise ship industry. Each Millennium Class cruise ship was to be 965 feet in length with a beam of 105 feet, featuring eleven decks capable of providing luxury services to 1,950 passengers. Additionally, with an anticipated cost of over $350,000,000.00 per cruise ship, for over one billion dollars in total investment in the Class, RCL wanted the Millennium Class to not only offer the very best aspects of classic, elegant cruising, but to do so using the most advanced technological features in order to deliver the highest level of performance available in the cruise ship industry.

30.     A cruise ship's performance is inextricably tied to the quality of its propulsion system. Accordingly, RCL desired to employ the most technologically advanced, highest quality, most efficient propulsion system available for its flagship Millennium Class fleet. Thus, RCL decided to employ a pod propulsion system.

## Pod Propulsion Systems

31.     Pod propulsion systems offer substantial operational benefits that traditional fixed shaft propulsion systems cannot match. Pod propulsion systems are integrated units that combine propeller shafts and motors in a streamlined, self-contained unit that is attached beneath the ship. The propeller that drives the ship is attached to an electric motor. The power level of a pod unit is usually measured in megawatts ("MW") as opposed to horsepower. The higher the MW's, the more powerful the motor. The first commercially successful pod propulsion systems used by the cruise ship industry, developed during the 1990's by ABB Industry OY and Kvaener-Masa Yards, Inc., were called the "Azipod".

32.     Pod propulsion units rotate through three hundred and sixty (360) degrees of motion, thus providing far greater maneuverability than traditional propulsion systems. As cruise ships have become larger, enhanced maneuverability has become increasingly important.  Additionally, pod units allow for more passenger and crew space because they are external to the ship, and therefore reduce the space required for engine machinery. Furthermore, the external location of the motor produces lower noise and vibration levels throughout the cruise ship. Finally, they deliver greater power efficiency and speed than traditional fixed shaft propulsion systems. Accordingly, pod

propulsion systems are now considered state of the art equipment on new cruise ships.  As a result, the cruise ship industry is a prime marketing target for pod manufacturers, and sales to this industry are critical to the success of such ventures.

### The Mermaid Pod Propulsion System

33.      Mermaid is the brand name of a pod propulsion system that is produced by a joint venture between Rolls Royce and Alstom.

34.      Rolls Royce and Alstom claim to have been cooperating in a pre-study on pod propulsion systems as early as 1992.  As noted, the cruise ship industry is a major consumer of pod propulsion systems.  Accordingly, Rolls Royce and Alstom developed a marketing strategy to target the cruise ship industry.  Rolls Royce and Alstom analyzed the cruise ship industry, its operation, and its needs.  Plans to introduce an optimized pod propulsion system suitable for speeds up to about 30 knots were allegedly developed sometime in 1994.  However, the first Mermaid was not actually constructed until August 1999.  It is now apparent that, in their ill planned collective effort to bring the Mermaid to market on an expedited basis, Rolls Royce and Alstom failed to undertake the necessary research, development, and testing to ensure the proper functioning of the Mermaid.

35.      The Mermaid consists of an azimuthing fixed pitch propeller mounted on the forward end of a housing assembly and is mounted underneath a ship's after end structure.  The propeller and housing assembly, known as a "pod," may rotate through 360 degrees and, thus, provide thrust in any direction.  The propeller is also reversible.  When the ship is on passage, the pod is turned in a manner similar to the rudder of a conventional ship.  The Mermaid utilizes an electric motor drive

system which provides thrust similar to the engines of a conventional ship. Electrical power may

be provided to the Mermaid using diesel engines, gas turbines or steam turbines. The pod's housing

contains the main shaft line which transfers energy from the motor to the propeller, a drainage

system which allows for the removal of any water which enters the pod, an air distribution system,

and electrical cabling. For reference purposes, a drawing of the Mermaid pod is attached hereto as

Exhibit "1".

36.     The Mermaid's main shaft line is supported by three bearings: two thrust bearings and

a radial bearing.

37.     The thrust bearings serve to absorb both axial (or thrust) forces and radial forces.

Each bearing is a roller bearing that is lubricated by its own oil system. Lubricating oil is circulated

by a pump. The two bearings sit inside a housing, which is sealed on the drive end side by two lip

sealing rings, and is sealed on the other side by a shaft end cover. The thrust bearings are monitored

for temperature, vibrations and purity of lubrication oil.

38.     Lip type sealing rings are adjacent to each other and both face the oil filled bearing.

The space between the sealing rings is fed with the same type of oil as the bearings, but at a lower

pressure.

39.     The radial bearing is located on the drive end of the shaft. This bearing provides

support for the shaft and absorbs radial forces which occur with expansion of the length of the shaft.

It is a spherical self-adjusting carb-roller bearing which allows the shaft to expand in an axial

direction due to temperature. Like the thrust bearings, the radial bearing has an independent oil system, complete with its own circulating pump.

40.     Both types of bearings are supposed to be sealed to protect the Mermaid from the entry of sea-water. The seal consists of a balanced type mechanical radial face seal to seal the Mermaid from the sea and two lip sealing rings to seal the sea from the bearing lubrication oil. A void space is created between the two seals, which acts as a boundary between the sea and the oil. The void space has a drain to allow any oil leakage or water ingress to be removed from the cavity.

41.     The inboard radial bearing seal consists of two lip type sealing rings with a film of oil between the rings. The oil in the seal is the same as that used by the bearing, but at a lower pressure.

## Rolls Royce and Alstom Deceive Royal Caribbean

42.     By the late 1990's, Royal Caribbean's plans to build the Millennium Class of cruise ships were well known within the cruise ship industry. In or around January 1998, Royal Caribbean met with four European shipyards to discuss the project. One of these shipyards was Chantiers de l'Atlantique ("CAT"), a subsidiary of Alstom, S.A. that specializes in cruise ship construction. These meetings focused on the general designs Royal Caribbean desired, and Royal Caribbean stated its intention to fit these ships with pod propulsion systems.

43.     Mermaid was, at the time, unknown to Royal Caribbean; Royal Caribbean anticipated installing the Azipod system. Representatives of CAT identified Mermaid as a joint venture between Rolls Royce and Alstom.

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 14

44.     Upon information and belief, at this time Rolls Royce and Alstom were extremely knowledgeable regarding the cruise line industry and understood and appreciated the importance of dependable performance to the reputation and economic success of a cruise line such as Royal Caribbean.   Further, upon information and belief, Rolls Royce and Alstom understood and appreciated the critical role played by travel agents in booking passengers on Royal Caribbean cruise ships.  Upon information and belief, Rolls Royce and Alstom thus knew that Royal Caribbean had expended valuable time and resources in developing advantageous business relationships with travel agents throughout the world.  Upon information and belief, Rolls Royce and Alstom knew that such advantageous business relationships existed between Royal Caribbean and its travel agents, and knew that if the Millennium Class of cruise ships could not perform due to faulty propulsion systems, those advantageous business relationships would suffer.

45.     From the time Rolls Royce and Alstom became aware of the Millennium Class cruise ship construction project, Rolls Royce and Alstom, in furtherance of a conspiracy to deceive and defraud Royal Caribbean, either directly or through their agents, made numerous false representations of material fact regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency and operational benefits of the Mermaid propulsion system to Royal Caribbean, including but not limited to:

(a)     that by 1998 Rolls Royce and Alstom had already constructed and deployed a seven megawatt Mermaid pod;

(b)     that a device designed to allow removal and replacement of the Mermaids

without dry docking would be available for Royal Caribbean's Millennium

Class cruise ships;

(c)     that extensive research, testing, and development had been performed upon

the Mermaid;

(d)     that the Mermaid employed more advanced technology than the rival Azipod

unit;

(e)     that the Mermaid shaft seals were of the same design as seals which had been

used throughout the maritime industry for years, and were thus more reliable

than those used on the rival Azipod unit;

(f)     that the mechanical components (including bearings, seals, couplings, etc.)

employed in the Mermaid  had a long history of use in the shipbuilding

industry, and were thus more reliable than those used on the rival Azipod

unit;

(g)     that the Mermaid's component designs had been adequately adjusted to

compensate for the increased stresses and loads encountered by a pod, which

are not experienced by a traditional fixed shaft arrangement common to most

vessels;

(h)     that the seals and bearings employed in the Mermaid constituted a superior

technical solution to those employed in the rival Azipod unit;

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 16

    (i)    that Rolls Royce and Alstom had a long history of producing superior electrical and mechanical equipment for ship propulsion applications, and that therefore the Mermaid would be superior to the rival Azipod unit;

    (j)    that the Mermaid could be operated without any restrictions that would negatively impact the cruise ships' performance at sea; and

    (k)    that Rolls Royce and Alstom would work jointly and in a cooperative manner, combining their resources, expertise, and skill, to provide any necessary services or repairs to the Mermaids following their delivery and installation.

46.    Rolls Royce and Alstom knew that these false and misleading representations would be, and were in fact, critical inducements to Royal Caribbean in choosing Mermaid over the rival Azipod. The pod removal device was particularly important because it eliminated the necessity of dry docking, which is very expensive, requires removal of the ship from passenger service, and results in loss of revenue. Also there are a limited number of dry dock facilities large enough to handle a ship as large as a Millennium Class cruise ship. However, despite Rolls Royce and Alstom's representations to the contrary, no such pod removal device existed at the time, and none has ever been built.

47.    The representations that extensive research, testing, and development had been performed on the Mermaid (including false statements that a 7 MW unit had already been built and deployed) also significantly impacted Royal Caribbean's decision to use the Mermaid as opposed

to using the Azipod, already in use in cruise ships. However, the Mermaid was in fact merely an unproven, experimental propulsion concept at the time these representations were made to Royal Caribbean. In fact, at the time of the Defendants' representations to Royal Caribbean, the Mermaid did not exist at all, had never been used on cruise ships, and had never even been tested in cruise ship applications.

48.    Between January and June 1998, Rolls Royce and Alstom, themselves, and through their agents, represented to Royal Caribbean that a 7 MW Mermaid had already been constructed and been successfully placed in service. This representation, that at least one Mermaid had already been successfully employed, was important to Royal Caribbean's choice to use the Mermaid instead of the Azipod. However, this representation was false. In fact, the very first Mermaid was not built and employed in service until well after Royal Caribbean had already committed to using the Mermaid on its Millennium Class of cruise ships.

49.    Representatives of Rolls Royce and Alstom, in meetings in Florida, as well as other locations, also emphasized that the mechanical components (bearings, seals, couplings, etc.) employed in the Mermaid would be reliable in performance because they had a long history of use in the shipbuilding industry. Specifically, they stressed that the shaft seals employed in the Mermaid were of the same proven and reliable design as shaft seals which had been used throughout the maritime industry for years. This representation has been proven wrong due to the fact that the seals on the Mermaids on all of the Millennium Class of cruise ships have failed repeatedly, as is set forth more fully below.

50.     Furthermore, Rolls Royce falsely claimed that the Mermaid's component designs had been adequately adjusted to compensate for the increased stresses and loads encountered by a propulsion pod, over and above the stresses placed on a traditional fixed shaft arrangement. This has been proven untrue by the repeated bearing failures experienced by the defective Mermaids installed on all four of the Millennium Class cruise ships.

51.     Rolls Royce and Alstom also emphasized the long history of their respective companies in producing superior electrical and mechanical equipment for ship propulsion applications as part of their effort to convince Royal Caribbean to choose the Mermaid over the Azipod. The repeated failures of the Mermaids, and Rolls Royce and Alstom's complete inability to repair the Mermaids so that they can perform as warranted, speak to the veracity of this representation.

52.     Alstom also exploited its affiliation with CAT to persuade Royal Caribbean to choose the Mermaid over the Azipod. Between March and June 1998, Alstom, either directly or through its agents, discouraged Royal Caribbean from selecting the Azipod for use aboard the Millennium Class cruise ships, citing cost and logistical advantage to using French products when building a cruise ship in a French shipyard. These representations were made despite the fact that Alstom was well aware that the Mermaid was in fact merely an unproven, experimental propulsion concept that did not exist at all, had never been used on cruise ships, and had never even been tested in cruise ship applications.

53.     The Defendants also emphasized the superior performance capabilities of the Mermaid, representing that it could be operated without restrictions, thus maximizing the performance of the cruise ships. This too proved to be false. In fact, severe limitations have been placed upon the operation of the Mermaid as a result of its repeated failures.

54.     In June 1998, and in specific reliance on the false and misleading material representations made by Rolls Royce and Alstom, either directly or through their agents, Royal Caribbean placed an order for the installation of dual 19.5 MW Mermaids for all four cruise ships in the Millennium Class. But for the false and misleading material representations made by Rolls Royce and Alstom, Royal Caribbean would not have purchased the Mermaid.   Because of the numerous material misrepresentations and deceitful acts and practices of Rolls Royce and Alstom, it was impossible for Royal Caribbean to evaluate adequately the advisability of purchasing the Mermaid.

**Mermaid Pods on the MILLENNIUM Fail to Perform, Resulting in
Cancelled Voyages and Tarnishing Royal Caribbean's Reputation with its Passengers**

55.     The first Millennium Class cruise ship to be delivered was the MILLENNIUM. The MILLENNIUM has experienced ten separate failures over the past three years, requiring her unscheduled removal from service on four separate occasions.  Each period during which the cruise ship was out of service cost Royal Caribbean millions of dollars and severely tarnished the reputation of the Millennium Class cruise ships.

*Royal Caribbean, et al.  v. Rolls Royce PLC, et al.*
Page 20

56.    In May 2000, during MILLENNIUM's pre-delivery sea trials, it was discovered that the ship could not achieve the proper speed.  Rolls Royce and Alstom had represented that the ship could obtain a speed of 24 knots while propulsion motors operated at 87% of the maximum rating with the ship loaded on design draught and even keel.

57.    During the MILLENNIUM's sea trials, the ship's pod motors produced the maximum rated output of 19.5 MW, but were incapable of achieving the anticipated speed of 24 knots.

58.    Upon returning from sea trials, Alstom personnel met and discussed possible solutions for the Mermaid's speed deficiency.  After brief deliberation, Alstom personnel decided to solve this problem by increasing the excitation to the pod motors, thereby raising the maximum power output to 20.3 MW.  Neither Rolls Royce nor Alstom spent any time testing the Mermaids to determine whether the increased excitations would produce any negative side effects.  Rolls Royce and Alstom also failed to thoroughly examine and test the Mermaids to determine why the motors did not generate enough power to produce the desired speed.

59.    Royal Caribbean officials expressed their dissatisfaction with this remedy.  However, Rolls Royce and Alstom insisted that this was the only feasible solution.  Upon increasing the excitation to the pod motors, the MILLENNIUM attained a maximum speed of 23.7 knots.

60.    All pod motors built subsequent to the delivery of the MILLENNIUM were rated for 20.3 MW, as opposed to the original design of 19.5 MW.  This increased power output may have caused detrimental side effects to the pod motors and the associated technical components. Furthermore, no substantive changes were made to the design or construction of the motors or

mechanical components of the Mermaids to compensate for any increased loads caused by the higher power output. Alstom declined to make any substantive changes to avoid the costly process of redesigning and reconstructing the Mermaids.

61.   The MILLENNIUM was delivered to Royal Caribbean on June 22, 2000. In July 2000, over-excitation protection devices--known as varistors--failed, causing the ship to be without propulsion power for a period of ten hours, inconveniencing passengers on the voyage and disrupting the schedule of the cruise.

62.   In September 2000, MILLENNIUM pods experienced excessive water ingress. The newly delivered MILLENNIUM was forced to take an unscheduled dry dock, interrupting the cruise ship's normal schedule, and forcing Royal Caribbean to inconvenience and reaccommodate thousands of passengers at great expense. The MILLENNIUM was taken out of service for approximately one full month. The pods were opened while the ship was in a dry dock in a Newport News shipyard between the middle of November and the middle of December, 2000. An improper alignment of the pod end covers and a resulting compromise of the end cover o-rings was discovered.

63.   In December 2000, immediately after leaving the dry dock in Newport News, the upper pole connections on the starboard pod motor began to tear. The gap created by the tear caused electrical arcing, burning two sets of poles and destroying much of the poles' insulation. The starboard pod motor was operated at reduced power until the cruise ship could be removed from

service. This unscheduled removal from service cost Royal Caribbean millions of dollars in lost revenue and further damaged the reputation of the Millennium Class cruise ships.

64.     To remedy the failure of the upper pole connections in the starboard pod motor, the entire starboard pod on the MILLENNIUM was removed and replaced with the pod intended for the SUMMIT, which had yet to be delivered. Alstom representatives failed to disclose to Royal Caribbean any reasons why the upper pole connections had failed.

65.     Water ingress inside the pods was discovered again in January 2001. This time the cause of water ingress was attributed to faulty shaft seals. The MILLENNIUM was forced to return to the Newport News shipyard in April 2001 for yet another unscheduled dry dock. Once again, the MILLENNIUM's scheduled voyages were cancelled, thousands of passengers experienced the disruption of their vacations, and were reaccommodated at Royal Caribbean's expense. Alstom replaced the pod shaft seals, which prior to the sale had been touted as proven through use in the maritime industry for years, with a new set of shaft seals which employed a totally different design.

66.     Unequal excitation current between the port and starboard pod motors on the MILLENNIUM was observed in May 2001.

67.     In August 2001, the lower pole-to-pole connections in the port and starboard pod motors on the MILLENNIUM failed. The problem was supposedly remedied by a modification, which was subsequently performed upon all pod motors in use aboard Millennium Class cruise ships. However, as a result of this modification, the performance of the Mermaid has been

restricted, so that the MILLENNIUM cannot perform as intended. Upon instruction of Rolls Royce and Alstom, Millennium Class cruise ship Masters are required to accelerate and decelerate the motors in stages, avoid any turns while making more than fifteen (15) knots, and to make all turns in increments of no greater than two (2) degrees.

68.    In the fall of 2001, copper particles were discovered in the lubricating oil systems of the port and starboard pods on the MILLENNIUM. Rolls Royce recommended changing the type of lube oil in use, but did not provide any explanation as to why copper was discovered in the oil or its possible sources. Around the same time, iron particles were discovered in the slewing bearings of both the port and starboard pods. Again, Rolls Royce recommended changing the type of oil in use in the bearing.

69.    Shaft seals in the MILLENNIUM pods began allowing water to enter the bearing again in April 2002. The problem was not corrected until the ship once again was forced into another unscheduled dry dock in the Grand Bahamas on November 3, 2002. For yet a third time, the MILLENNIUM's scheduled voyages were cancelled, again disrupting the vacations of thousands of passengers, who were reaccommodated at Royal Caribbean's expense.

70.    While the MILLENNIUM was in dry dock for two weeks in November, 2002, the bearings in each pod were inspected for wear. Severe discoloration was discovered, indicating overheating or poor lubrication. Rolls Royce technicians replaced radial and thrust bearings on both pods.

71.    At the same time that the radial and thrust bearings were replaced in the MILLENNIUM's pods, Rolls Royce technicians informed Royal Caribbean that the bearing components were defectively manufactured.

72.    On July 12, 2003, metal particles were discovered in the lube oil for the MILLENNIUM's port pod thrust bearings, evidencing another bearing failure, and requiring yet a fourth emergency dry docking. This occurred less than 8 months after all bearings on the MILLENNIUM had been replaced. For the fourth time in only three years of service, the MILLENNIUM's scheduled voyages were cancelled, disrupting the vacations of thousands of passengers, who were reaccommodated at Royal Caribbean's expense.

## Mermaid Pods on the INFINITY Fail to Perform, Causing Voyages to be Cancelled and Further Tarnishing Royal Caribbean's Reputation with its Passengers

73.    The second Millennium Class cruise ship to be delivered was the INFINITY, in March 2001. Royal Caribbean was highly concerned that the Mermaids function properly in light of the multiple problems experienced with the MILLENNIUM. Accordingly, Rolls Royce performed post delivery inspections and measurements of the radial and thrust bearings inside each pod. Following these inspections, Rolls Royce assured Royal Caribbean that the Mermaids were operating properly and everything was satisfactory. However, since INFINITY's delivery just over two years ago, the cruise ship has experienced four separate failures of her Mermaids, requiring her removal from service three times. Each of these interruptions of service has lasted between two and four

weeks, has cost Royal Caribbean millions of dollars in lost revenue, and has severely tarnished the reputation of the Millennium Class cruise ships.

74.    In May 2001, only weeks after its reassurances that the Mermaids were functioning properly and all was well, Rolls Royce informed Royal Caribbean that excessive vibrations were detected across the bearings. Additionally, lube oil filters in the starboard Mermaid were discovered clogged with metal particles. Rolls Royce recommended the immediate removal from service of the starboard pod.

75.    The INFINITY was forced into an unscheduled emergency dry dock in Vancouver, British Columbia in June 2001. The INFINITY's scheduled voyages were cancelled, disrupting the vacations of thousands of disappointed passengers, who were reaccommodated at Royal Caribbean's expense. When the pods were dismantled, Rolls Royce technicians discovered that the radial bearing was approximately 80% destroyed. Technicians attributed this failure to either a manufacturing defect or a material defect in bearing components, or to contamination of bearing components during the assembly process.

76.    In July 2001, INFINITY crew members discovered cracks in several of the lower pole to pole connections on the motors in both pods. Although the damaged connectors were replaced, the resulting modification to the Mermaids on the INFINITY have caused restrictions to be placed on the performance, so that the INFINITY cannot perform as intended. Upon instruction of Rolls Royce and Alstom, Millennium Class cruise ship Masters are required to accelerate and decelerate

the motors in stages, avoid any turns while making more than fifteen (15) knots, and to make all turns in increments of no greater than two (2) degrees.

77.    In March 2002, metal particles were discovered in the lube oil supplied to the thrust bearing in INFINITY's starboard pod. For the second time in its short operating history, in April of 2002, the INFINITY was forced into an unscheduled dry dock due to a Mermaid's failure to perform. For the second time in only nine months, the INFINITY's scheduled voyages were cancelled, again disrupting the vacations of thousands of disappointed passengers, who were reaccommodated at Royal Caribbean's expense. Upon inspection, Rolls Royce technicians determined that the thrust bearings and housings in both pods were heavily damaged and required replacement.

78.    Rolls Royce also replaced the radial bearings in INFINITY's pods as well during the April 2002 dry dock. Rolls Royce informed Royal Caribbean that new thrust and radial bearings would be installed in INFINITY's pods.

79.    Rolls Royce deliberately deceived Royal Caribbean by claiming that new radial bearing components were installed in the INFINITY pods during the April 2002 dry dock. It was later discovered that the radial bearings installed in the INFINITY pods at that time were actually refurbished bearings removed from another set of pods.

80.    At the completion of the April 2002 dry docking of the INFINITY, Rolls Royce and Alstom represented to Royal Caribbean that they were confident that the cause of the Mermaid's problems had been discovered and corrected. However, Rolls Royce and Alstom once again refused to disclose the cause of the Mermaid's problems to Royal Caribbean.

81.   In January 2003, large metal particles were detected again in the lube oil supplied to the thrust bearings of INFINITY's port and starboard pods.  Due to the extent of this problem, the INFINITY was for a third time in its short operating history forced into an emergency dry dock, this time in Newport News on February 13, 2003.  The INFINITY remained there, inactive, until March 7, 2003.  Accordingly, for the third time in only eighteen months, the INFINITY's scheduled voyages were cancelled, yet again disrupting the vacations of thousands of disappointed passengers, who were reaccommodated at Royal Caribbean's expense.

**Mermaid Pods on the SUMMIT Fail to Perform, Causing the Cancellation of More Voyages and Further Tarnishing Royal Caribbean's Reputation with its Passengers**

82.   The third of the Millennium Class cruise ships, the SUMMIT, was delivered on August 31, 2001.  During its brief existence, SUMMIT has experienced two separate and significant Mermaid bearing failures requiring interruptions of service.  These interruptions cost Royal Caribbean millions of dollars in lost revenue and further severely tarnished the reputation of the Millennium Class cruise ships.

83.   In March 2002, only six month's after its delivery, SUMMIT crew members discovered metal particles clogging the lube oil filters of the port pod radial bearing lube oil system. Rolls Royce was notified and immediately directed Royal Caribbean to send the vessel to an emergency dry dock to allow inspection of the bearings.  As this problem occurred almost simultaneously with the thrust bearing failures in the pods attached to INFINITY, Royal Caribbean sent the SUMMIT to the same dry dock as the INFINITY. The SUMMIT's scheduled voyages were

cancelled, disrupting the vacations of thousands of disappointed passengers, who were reaccommodated at Royal Caribbean's expense.

84.     Upon opening the port pod radial bearing housing, technicians discovered the bearing rollers were completely destroyed. Rolls Royce removed the damaged bearing components and installed new radial bearings.

85.     The SUMMIT thrust bearings were inspected as well. According to Rolls Royce technicians, the thrust bearings were in satisfactory condition at the time. However, Rolls Royce also informed Royal Caribbean that they were concerned that the thrust bearings in SUMMIT's pods could fail at any time, just as the thrust bearings in INFINITY's pods had failed. Therefore, Rolls Royce recommended replacing the SUMMIT thrust bearings in each pod as a precautionary measure.

86.     At the completion of the April 2002 dry docking of the SUMMIT, Rolls Royce and Alstom told Royal Caribbean that they were confident the cause of the problems had been discovered and corrected. However, Rolls Royce and Alstom once again refused to disclose the cause of the problems to Royal Caribbean.

87.     At the beginning of 2003, metal particles were discovered in the lube oil systems for both bearings of both pods attached to the SUMMIT. The SUMMIT pods also experienced excessive water ingress in the pods, the cause of which has yet to be determined by the Defendants.

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 29

### Mermaid Pods on the CONSTELLATION Fail to Perform, Again Causing Cancellation of Voyages and Further Tarnishing Royal Caribbean's Reputation with its Passengers

88.     The last of the Millennium Class cruise ships, the CONSTELLATION, was delivered on May 11, 2002.

89.     The CONSTELLATION's starboard pod experienced water leakage past its shaft seals during sea trials. Sea trials were halted, and the ship was placed in dry dock. This delayed delivery of the CONSTELLATION and forced Royal Caribbean to cancel a previously scheduled cruise, disappointing almost two thousand passengers and forcing Royal Caribbean to reaccommodate them.

90.     After the ship was placed in dry dock and CONSTELLATION's pods were opened, Rolls Royce technicians inspected the bearings and seals and identified the cause of the problem as an improperly tightened flushing hole on one of the bearings. The condition was supposedly corrected and the ship resumed sea trials.

91.     Less than twenty four hours after leaving dry dock, however, water was observed passing through CONSTELLATION's starboard pod shaft seals. Again the ship was returned to dry dock, further delaying the ship's delivery, and technicians removed and replaced the pod's shaft seals. Once again, this forced Royal Caribbean to cancel scheduled voyages and reaccommodate thousands of disappointed customers, and further severely tarnished the reputation of the Millennium Class cruise ships..

*Royal Caribbean, et al.  v. Rolls Royce PLC, et al.*
Page 30

### The 2002 London Meeting

92.      On March 25, 2002, Jack Williams, President of Royal Caribbean, along with Angelos Argyropoulus, Vice President of Marine Operations for Celebrity Cruises, traveled to London to meet with various representatives of Rolls Royce and Alstom, among others, to discuss the problems which had been plaguing the Mermaid pods.

93.      The following people, among others, were in attendance:  Dr. Saul Lanyado, Rolls Royce, President - Marine; Andreas Fokkens, Rolls Royce, President - Commercial Marine; Julia King, Rolls Royce, Director - Engineering & Technology, Marine; David Warriner, Rolls Royce, Commercial Executive, Marine; David Wilson, Alstom PC, Senior Vice President, Motors & Generators; and Michel Aublant, Alstom PC, Director of Service Dept., Marine & Offshore and Key Account Manager for Mermaid to CAT.

94.      Upon information and belief, this meeting was merely an element of the Defendants' ongoing conspiracy to deceive and defraud Royal Caribbean, and to cover up the fact that the Mermaid pods suffered from numerous design and manufacturing defects that the Defendants either did not know how to solve or would not solve due to the redesign costs involved.  The purpose of this ongoing conspiracy was to hide the truth about the numerous design and manufacturing defects of the Mermaids so that Royal Caribbean would be tricked into accepting delivery of the final two units to be installed on the CONSTELLATION, the last Millennium Class cruise ship to be delivered to Royal Caribbean.

95.    In furtherance of the above-mentioned conspiracy, a presentation was given by Rolls Royce officials, purportedly addressing the problems affecting the pod bearings of the INFINITY and SUMMIT, then currently both in emergency dry dock due to Mermaid failures, and the corrective actions supposedly taken to solve the problems and prevent their recurrence. Rolls Royce divided the problems into two categories: those affecting the radial bearings and those affecting the thrust bearings.

96.    Rolls Royce claimed that the problems in the radial bearings were due to a combination of an outer bearing race surface deviation which created a "step" in the bearing surface, particle contamination in the oil, and high water content in the oil due to leakage past the shaft seals.

97.    Rolls Royce claimed to have removed the "step" in the surface of the radial bearings in each pod attached to the SUMMIT and the INFINITY. They also claimed to have replaced the segmented seals originally used in the bearings, which Rolls Royce and Alstom had claimed prior to the sale were proven to perform through years of service in the maritime industry, with solid SiC seals of a different design.

98.    Rolls Royce also revised oil cleanliness routines, installed additional filters, and instructed vessel personnel to use a higher viscosity oil (150 Cs instead of 100 Cs) in the radial bearings aboard all four Millennium Class cruise ships.

99.    Additionally, Rolls Royce introduced plans to implement an oil particle and vibration monitoring system in the pods of each ship as an additional safeguard.

100.    According to Rolls Royce, the thrust bearings suffered from multiple problems. Certain machined dimensions of the bearings were claimed to be barely within tolerance, causing the aft upper bearing race to foul against the bearing housing, resulting in fretting marks on the race surface. Foreign particles were claimed to have been discovered in the oil allegedly causing scoring and indentation on bearing components. Corrosion was cited as an additional problem.

101.    Rolls Royce technicians claimed to have corrected these conditions by machining the thrust bearing components and increasing clearances between the bearing components and housing.

102.    Rolls Royce also revised the oil cleanliness routines, installed additional filters, and drilled cross flow flushing holes in the thrust bearing components.

103.    Rolls Royce also discussed the discovery of metal particles in the INFINITY and SUMMIT pod bearings. Bearing component manufacturer SKF analyzed the metal debris and reported that it was hard and ductile. This suggested, according to Rolls Royce, that the bearing lube oil was contaminated from a source outside the bearing. However, Rolls Royce did not perform any independent analysis and could not identify any possible source for this contamination. Furthermore, Rolls Royce initially refused to provide Royal Caribbean with a copy of the SKF report, claiming that Royal Caribbean was not entitled to view it.

104.    On information and belief, as part of the ongoing conspiracy to defraud and deceive Royal Caribbean, one week after the London meeting, Royal Caribbean was informed that Rolls Royce was sure that the problems aboard the SUMMIT and the INFINITY would not be a problem on the CONSTELLATION, and that Royal Caribbean should accept delivery of the

CONSTELLATION. Rolls Royce further claimed that all pods would operate properly, and that they had conducted extensive calculations to support such a claim.  Despite such assurances, the pods aboard all four Millennium Class cruise ships experienced bearing failures subsequent to the delivery of the CONSTELLATION.

### The Rolls Royce Investigation

105.    In February 2003, after yet another set of bearing failures in the pods attached to the INFINITY, and the detection of warning signs of bearing problems on the SUMMIT, Rolls Royce organized a large scale investigation ostensibly to determine the cause of the repeated bearing failures.

106.    Stig Lonngren of Rolls Royce was in charge of the "investigation". Nine teams of technical personnel were assembled to examine various aspects of the operation of the pod bearings, including the following:  the complete bearing arrangement and the impact of the electrical motor upon the arrangement; bearing operation in extreme conditions; assessment and review of specified loads; potential damage caused by electric current and fatigue analysis; study and review of the pod mounting procedures throughout the history of the vessels;  and an evaluation of the maneuvering/running history of the vessels.

107.    The nine teams met with Royal Caribbean officials on April 29 and 30, 2003 to discuss the results of the investigation.  Despite employing numerous "experts" and spending three months investigating the problems with the pods, *Rolls Royce did not provide Royal Caribbean with any substantive answers as to the cause of the repeated failures of the Mermaids*.  Furthermore, bearing

problems continue to plague the Millennium Class cruise ships, occurring again aboard the MILLENNIUM on July 12, 2003.

108.    Upon information and belief, Rolls Royce and Alstom do not know how to fix the numerous design and manufacturing defects of the Mermaids installed on Royal Caribbean's Millennium Class cruise ships. Upon information and belief, since these problems have first appeared, Rolls Royce and Alstom have engaged in an ongoing conspiracy to cover up the fact that the Mermaids suffer from numerous design and manufacturing defects that the Defendants have been unable or unwilling properly to remedy. Upon information and belief, since the first failures of the Mermaids on the MILLENNIUM, Rolls Royce and Alstom have engaged in an ongoing conspiracy to prevent Royal Caribbean from discovering this fact so that Royal Caribbean would continue to accept delivery of additional Mermaids for installation on the INFINITY, SUMMIT, and CONSTELLATION. Upon information and belief, the repeated investigations, trumped up fixes, and expert committees instituted by Rolls Royce and Alstom have been nothing more than an elaborate charade to cover up the truth, and to convince Royal Caribbean that the Mermaids on the Millennium Class cruise ships could eventually be made to work as repeatedly represented by their manufacturers, the Defendants herein.

109.    Upon information and belief, Rolls Royce and Alstom knew that each time they pretended to fix a failed pod, it would in fact break again, because Rolls Royce and Alstom in reality had no solution whatsoever for the complex design and manufacturing defects plaguing the Mermaids installed on Royal Caribbean's Millennium Class cruise ships, nor did they want to incur the cost of undertaking a complete redesign.

110.    Upon information and belief, Rolls Royce and Alstom knowingly decided to deceive Royal Caribbean into believing that the Mermaids could be made to function properly instead of admitting to Royal Caribbean that the Mermaids suffered from numerous complex design and manufacturing defects that the Defendants could not or would not solve.

111.    Upon information and belief, Rolls Royce and Alstom knew that each time a Millennium Class cruise ship was required to be taken out of service for repair, Royal Caribbean would suffer immense negative publicity that would adversely interfere with its critical advantageous business relationships with travel agents throughout the world, the very travel agents responsible for booking passengers aboard Royal Caribbean's cruise ships.

112.    Upon information and belief, Rolls Royce and Alstom deceived, and conspired to deceive, Royal Caribbean into believing that the Mermaids on the Millennium Class cruise ships were fixed, that all was well, and that the ships would be able to operate their scheduled cruises, even though Rolls Royce and Alstom knew that, since the Mermaids were not actually fixed, it was substantially certain that the pods would continue to fail, which would interfere with Royal Caribbean's advantageous business relationships with travel agents throughout the world.

113.    Despite repeated demands, Rolls Royce and Alstom have refused to disclose to Royal Caribbean critical information in their possession regarding the problems with the bearings and other components of the Mermaids, rendering it impossible for Royal Caribbean to rely on assurances by Rolls Royce and Alstom as to their findings regarding the causes of failure of the Mermaids.

114.    As a direct and proximate result of Rolls Royce and Alstom's fraudulent and deceitful conspiratorial acts, together with their multiple breaches of express and implied warranties and violations of multiple Florida Statutes, Royal Caribbean has suffered, and will continue to suffer, hundreds of millions of dollars in damages due to costs of repairs and maintenance, unscheduled interruptions of operations, unscheduled transportation and housing of passengers, loss of goodwill with passengers, damage to its beneficial relationships with travel agents throughout the world, loss of reputation in the industry, loss of reputation and goodwill with its customer base, and the resulting lost past and future profits.   Additionally, the Mermaids will have to be replaced with properly functioning pods.   Plaintiffs are entitled to recover these damages from the Defendants due to their wrongful acts.

115.    In addition, Plaintiffs have incurred, and will continue to incur, attorneys' fees and costs directly attributable to the wrongful conduct of each of the named Defendants.   Plaintiffs are entitled to recover their attorneys' fees and costs from each of the Defendants, pursuant to Fla. Stat. §§501.211, 501.2105, and 817.41(6).

## Count I

### Breach of Express Warranties Against Rolls Royce and Alstom

116.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

117.    Rolls Royce and Alstom were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid within the meaning of section 672.313 of the Florida Statutes.

118.    Rolls Royce and Alstom have had numerous direct contacts with Royal Caribbean in person, by telephone, and through written correspondence, including the furnishing of diagrams, technical drawings and other informational materials, in which Rolls Royce and Alstom described the Mermaid with regard to its design, development, testing deployment, quality, durability, reliability, cost-efficiency, operational benefits, service, and repair and affirmed that the Mermaid was suited for the particular operational needs of the Millennium Class of cruise ships. In addition, Rolls Royce and Alstom affirmed to Royal Caribbean that the Mermaid was based upon proven technology which had been used throughout the maritime industry for years.

119.    Rolls Royce and Alstom's affirmations of fact, descriptions, and promises made to Royal Caribbean about the Mermaid became part of the basis of the bargain between Rolls Royce and Alstom and Royal Caribbean for the Mermaids on MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION, and, pursuant to section 672.313 of the Florida Statutes, created express warranties that the Mermaid would conform as stated and described.

120.    Royal Caribbean relied on the express warranties given by Rolls Royce and Alstom in purchasing and continuing to operate the Mermaids on the Millennium Class cruise ships.

121.    Rolls Royce and Alstom have breached their express warranties to Royal Caribbean in that the Mermaid was merely an experimental propulsion concept that was completely untested

in a cruise ship application, and does not perform as represented by the Defendants. In fact, the Mermaids delivered by Rolls Royce and Alstom to Royal Caribbean are unsuitable for use on a cruise ship because of significant design and manufacturing defects that neither Rolls Royce nor Alstom have been able to service or repair as warranted. As a result, the Mermaid is subject to constant and continuous problems requiring additional, unscheduled, extended, and expensive dry docks. In addition, it is apparent from the problems experienced with the Mermaids on the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION, that Mermaid propulsion technology is not yet proven technology, cannot be made to perform as warranted, and cannot be serviced and/or repaired as warranted.

122.    Royal Caribbean notified Rolls Royce and Alstom of the breaches immediately upon discovery, but Rolls Royce and Alstom have failed to remedy them.

123.    As a direct and proximate result of Rolls Royce and Alstom's breaches of warranty, Royal Caribbean has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies. Accordingly, Royal Caribbean is entitled to require the Defendants to replace the Mermaids with properly functioning pods, or to pay all costs of doing so. Additionally, Royal Caribbean has suffered substantial damages, including but not limited to, consequential and incidental damages.

## Count II

### Breach of Implied Warranty of Fitness for Particular Purpose Against Rolls Royce and Alstom

124.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

125.    Rolls Royce and Alstom were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid within the meaning of section 672.315 of the Florida Statutes.

126.    Rolls Royce and Alstom have had numerous direct contacts with Royal Caribbean in person, by telephone, and through written correspondence, including the furnishing of diagrams, technical drawings and other informational materials, in which Rolls Royce and Alstom informed Royal Caribbean that the Mermaid was a proven, reliable, state-of-the-art propulsion system with a design, technology and features that were superior to the other pod system on the market and conventional propulsion systems used on cruise ships, and which was especially suited for the particular operational needs of Royal Caribbean.

127.    At the time Rolls Royce and Alstom made these statements regarding the Mermaid, the Defendants had reason to know, and did know, of the particular purposes for which, and operational conditions in which, Royal Caribbean intended to use the Mermaid on its cruise ships.

128.    At the time Rolls Royce and Alstom made these statements regarding the Mermaid, these Defendants had reason to know that Royal Caribbean was relying in good faith upon Rolls Royce and Alstom's skill and judgment to select or furnish a suitable propulsion system for the

particular purposes and operational conditions in which Royal Caribbean intended to use its Millennium Class of cruise ships, the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION.

129.   Royal Caribbean did in fact rely upon Rolls Royce and Alstom's skill, judgment and representations regarding the Mermaid when deciding to purchase the Mermaids for installation on its cruise ships MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION.

130.   Rolls Royce and Alstom's representations created an implied warranty that the Mermaids were fit for the particular operational needs of Royal Caribbean cruise ships pursuant to section 672.315 of the Florida Statutes.

131.   Rolls Royce and Alstom have breached their implied warranties to Royal Caribbean, in that the Mermaid was merely an experimental propulsion concept that was completely untested in a cruise ship application, and does not perform as represented by the Defendants.  In fact, the Mermaids delivered by Rolls Royce and Alstom to Royal Caribbean are unsuitable for use on a cruise ship because of significant design and manufacturing defects that neither Rolls Royce nor Alstom have been able to repair.  As a result, the Mermaid is subject to constant and continuous problems requiring additional, unscheduled, extended, and expensive dry docks.  In addition, it is apparent from the problems experienced with the Mermaid pods on the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION that Mermaid propulsion technology is not yet proven technology, and cannot be made to perform as warranted.

132.   As a direct and proximate result of Rolls Royce and Alstom's breaches of warranty, Royal Caribbean has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Accordingly, Royal Caribbean is entitled to require the Defendants to replace the Mermaids with properly functioning pods, or to pay all costs of doing so.  Additionally, Royal Caribbean has suffered substantial damages, including but not limited to, consequential and incidental damages.

### Count III

### Breach of Implied Warranty of Merchantability Against Rolls Royce and Alstom

133.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

134.   Rolls Royce and Alstom were and are the designers, manufacturers, marketers, servicers, repairers, sellers and/or distributors of the Mermaid and are "merchants" of Mermaids within the meaning of section 672.314 of the Florida Statutes.

135.   Rolls Royce and Alstom have had numerous contacts with Royal Caribbean in person, by telephone, and through written correspondence, including the furnishing of diagrams, technical drawings and other informational materials, in which Rolls Royce and Alstom informed Royal Caribbean that the Mermaid was a proven, reliable, state-of-the-art propulsion system fit for the ordinary purpose of propelling cruise ships.

136.   Pursuant to section 672.314 of the Florida Statutes, Rolls Royce and Alstom's numerous and direct affirmations to Royal Caribbean about the Mermaid created implied warranties of merchantability in Royal Caribbean's agreement to install Mermaids on its cruise ships MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION.

137.   Rolls Royce and Alstom breached their implied warranties of merchantability because the Mermaid is not fit for the ordinary purpose of propelling a cruise ship. In fact, the Mermaids delivered by Rolls Royce and Alstom to Royal Caribbean are entirely unsuitable for use on a cruise ship because of significant design and manufacturing defects that neither Rolls Royce nor Alstom have been able to repair. As a result, the Mermaid is subject to constant and continuous problems requiring additional, unscheduled, extended and expensive dry docks. In addition, it is clear that Mermaid propulsion technology is not yet proven technology, and Rolls Royce and Alstom have been unable to make the Mermaid fit for the ordinary purpose of propelling a cruise ship.

138.   As a result of Rolls Royce and Alstom's breaches of warranty, Royal Caribbean has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies. Accordingly, Royal Caribbean is entitled to require the Defendants to replace the Mermaids with properly functioning units, or to pay all costs of doing so. As a direct and proximate result of Rolls Royce and Alstom's breaches of warranty, Royal Caribbean has in fact suffered substantial damages, including but not limited to, consequential and incidental damages.

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 43

## Count IV

### Negligent Misrepresentation Against Rolls Royce and Alstom

139.   Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

140.   Rolls Royce and Alstom, either directly or through their agents, made numerous representations of material fact regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, and operational benefits of the Mermaid propulsion system to Royal Caribbean, including but not limited to:

(a)   that by 1998 Rolls Royce and Alstom had already constructed and deployed a seven megawatt Mermaid;

(b)   that a device designed to allow removal and replacement of the Mermaids without dry docking would be available for Royal Caribbean's Millennium Class cruise ships;

(c)   that extensive research, testing, and development had been performed upon the Mermaid;

(d)   that the Mermaid employed more advanced technology than the rival Azipod unit;

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 44

(e)     that the Mermaid shaft seals were of the same design as seals which had been used throughout the maritime industry for years, and were thus more reliable than those used on the rival Azipod unit;

(f)     that the mechanical components (including bearings, seals, couplings, etc.) employed in the Mermaid had a long history of use in the shipbuilding industry, and were thus more reliable than those used on the rival Azipod unit;

(g)     that the Mermaid's component designs had been adequately adjusted to compensate for the increased stresses and loads encountered by a pod, which are not experienced by a traditional fixed shaft arrangement common to most vessels;

(h)     that the seals and bearings employed in the Mermaid constituted a superior technical solution to those employed in the rival Azipod unit;

(i)     that Rolls Royce and Alstom had a long history of producing superior electrical and mechanical equipment for ship propulsion applications, and that therefore the Mermaid would be superior to the rival Azipod unit;

(j)     that the Mermaid could be operated without any restrictions that would negatively impact the cruise ships' performance at sea;

(k)     that the Mermaid did not suffer from design and manufacturing defects that Rolls Royce and Alstom were unable to remedy, but that the Mermaid could

be effectively repaired to perform as represented by its manufacturers, the Defendants herein; and

(l)     that Rolls Royce and Alstom would work jointly and in a cooperative manner, combining their resources, expertise, and skill, to provide any necessary services or repairs to the Mermaids following their delivery and installation.

141.    These statements made by Rolls Royce and Alstom to Royal Caribbean concerned material facts.

142.    These statements made by Rolls Royce and Alstom to Royal Caribbean were false when made.

143.    In the exercise of reasonable care under the circumstances, Rolls Royce and Alstom should have known that these statements were false at the time they were made.

144.    At the time Rolls Royce and Alstom made these misrepresentations, they intended and/or expected that Royal Caribbean would rely upon these false representations in ordering the Mermaid pods for installation on the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION.

145.    Royal Caribbean reasonably and justifiably relied on these misrepresentations to its detriment. But for the misrepresentations by Rolls Royce and Alstom, Royal Caribbean would not have placed the Mermaid on the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION.

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 46

146.    As a direct and proximate result of the negligent misrepresentations of Rolls Royce and Alstom, Royal Caribbean has been damaged in that it paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies. Accordingly, Royal Caribbean is entitled to require the Defendants to replace the Mermaids with properly functioning units, or to pay all costs of doing so. Additionally, Royal Caribbean has suffered substantial damages as a result of the negligent misrepresentations of Rolls Royce and Alstom, including but not limited to, consequential and incidental damages.

## Count V

### Fraud in the Inducement by Rolls Royce and Alstom

147.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

148.    In order to induce Royal Caribbean to select the Mermaid for the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION, Rolls Royce and Alstom made numerous representations of material facts regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, and operational benefits of the Mermaid to Royal Caribbean, including but not limited to:

(a)    that by 1998 Rolls Royce and Alstom had already constructed and deployed a seven megawatt Mermaid;

(b)     that a device designed to allow removal and replacement of the Mermaids without dry docking would be available for Royal Caribbean's Millennium Class cruise ships;

(c)     that extensive research, testing, and development had been performed upon the Mermaid;

(d)     that the Mermaid employed more advanced technology than the rival Azipod unit;

(e)     that the Mermaid shaft seals were of the same design as seals which had been used throughout the maritime industry for years, and were thus more reliable than those used on the rival Azipod unit;

(f)     that the mechanical components (including bearings, seals, couplings, etc.) employed in the Mermaid had a long history of use in the shipbuilding industry, and were thus more reliable than those used on the rival Azipod unit;

(g)     that the Mermaid's component designs had been adequately adjusted to compensate for the increased stresses and loads encountered by a pod, which are not experienced by a traditional fixed shaft arrangement common to most vessels;

(h)     that the seals and bearings employed in the Mermaid constituted a superior technical solution to those employed in the rival Azipod unit;

(i)     that Rolls Royce and Alstom had a long history of producing superior electrical and mechanical equipment for ship propulsion applications, and that therefore the Mermaid would be superior to the rival Azipod unit;

(j)     that the Mermaid could be operated without any restrictions that would negatively impact the cruise ships' performance at sea; and

(k)     that Rolls Royce and Alstom would work jointly and in a cooperative manner, combining their resources, expertise, and skill, to provide any necessary services or repairs to the Mermaids following their delivery and installation.

149.   Rolls Royce and Alstom knew or should have known that these representations of material fact were false at the time they were made, and/or made these representations without knowledge of their truth or falsity.

150.   Rolls Royce and Alstom made these misrepresentations of material facts with the intent that Royal Caribbean rely on the misrepresentations and to induce Royal Caribbean to act on them by ordering the Mermaid for installation on the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION.

151.   Royal Caribbean reasonably and justifiably relied on these misrepresentations of material fact to its detriment. But for the misrepresentations of material fact by Rolls Royce and Alstom, Royal Caribbean would not have placed the Mermaid on the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION.

152.    As a direct and proximate result of the fraudulent inducements of Rolls Royce and Alstom, Royal Caribbean has been damaged, in that it finds itself with pod propulsion systems that do not function properly, and neither Rolls Royce nor Alstom has been able to correct the deficiencies. Accordingly, Royal Caribbean is entitled to require the Defendants to replace the Mermaids with properly functioning units, or to pay all costs of doing so.  Additionally, Royal Caribbean has suffered substantial damages caused by the fraud of Rolls Royce and Alstom, including but not limited to, consequential and incidental damages.

### Count VI

### Fraudulent Misrepresentation by Rolls Royce and Alstom

153.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

154.    From 1998 to the present, Rolls Royce and Alstom have made numerous representations of material fact to Royal Caribbean, including but not limited to:

    (a)    that by 1998 Rolls Royce and Alstom had already constructed and deployed a seven megawatt Mermaid;

    (b)    that a device designed to allow removal and replacement of the Mermaids without drydocking would be available for Royal Caribbean's Millennium Class cruise ships;

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 50

(c)     that extensive research, testing, and development had been performed upon the Mermaid;

(d)     that the Mermaid employed more advanced technology than the rival Azipod unit;

(e)     that the Mermaid shaft seals were of the same design as seals which had been used throughout the maritime industry for years, and were thus more reliable than those used on the rival Azipod unit;

(f)     that the mechanical components (including bearings, seals, couplings etc.) employed in the Mermaid had a long history of use in the shipbuilding industry, and were thus more reliable than those used on the rival Azipod unit;

(g)     that the Mermaid's component designs had been adequately adjusted to compensate for the increased stresses and loads encountered by a pod, which are not experienced by a traditional fixed shaft arrangement common to most vessels;

(h)     that the seals and bearings employed in the Mermaid constituted a superior technical solution to those employed in the rival Azipod unit;

(i)     that Rolls Royce and Alstom had a long history of producing superior electrical and mechanical equipment for ship propulsion applications, and that therefore the Mermaid would be superior to the rival Azipod unit;

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 51

(j)     that the Mermaid could be operated without any restrictions that would negatively impact the cruise ships' performance at sea;

(k)     that the Mermaid did not suffer from design and manufacturing defects that Rolls Royce and Alstom were unable to remedy, but that the Mermaid could be effectively repaired to perform as represented by its manufacturers, the Defendants herein; and

(l)     that Rolls Royce and Alstom would work jointly and in a cooperative manner, combining their resources, expertise, and skill, to provide any necessary services or repairs to the Mermaids following their delivery and installation.

155.     Rolls Royce and Alstom knew these representations of material fact were false at the time they were made, and/or made these representations knowing that they were without knowledge of the statements' truth or falsity.

156.     Rolls Royce and Alstom made these representations with the intent that Royal Caribbean would rely on the false statements.

157.     Royal Caribbean reasonably and justifiably relied on the misrepresentations to its detriment.

158.     As a direct and proximate result of the fraud of Rolls Royce and Alstom, Royal Caribbean has spent millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Accordingly, Royal Caribbean is

entitled to require the Defendants to replace the Mermaids with properly functioning units, or to pay all costs of doing so. Additionally, Royal Caribbean has suffered substantial damages caused by the fraud of Rolls Royce and Alstom, including but not limited to, consequential and incidental damages.

## Count VII

### Deceptive and Unfair Trade Practices Against Rolls Royce and Alstom

159.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

160.     Royal Caribbean is a "consumer" as defined by section 501.203(7) of the Florida Statutes.

161.     Rolls Royce and Alstom's actions in soliciting, marketing, promoting, advertising, offering, providing, selling and distributing the Mermaid to Royal Caribbean in Florida constitute "trade or commerce" under section 501.203 of the Florida Statutes.

162.     Rolls Royce and Alstom's numerous misrepresentations to Royal Caribbean regarding the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, and operational benefits of the Mermaid constituted unconscionable, unfair and deceptive acts or practices in the conduct of trade or commerce in violation of section 501.204 of the Florida Statutes.

163.     As a result of Rolls Royce and Alstom's unlawful practices in violation of section 501.204 of the Florida Statutes, Royal Caribbean has incurred substantial actual damages.

164.    As a direct and proximate result of Rolls Royce and Alstom's unlawful practices in violation of section 501.204, Royal Caribbean has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies. Accordingly, Royal Caribbean is entitled to actual damages. Additionally, under sections 501.211 and 501.2105 of the Florida Statutes, Royal Caribbean is entitled to recover from Rolls Royce and Alstom, reasonable attorneys' fees and costs incurred in this action.

### Count VIII

#### Negligent Testing, Inspecting, Repairing, and/or Servicing
#### Against Rolls Royce and Alstom

165.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

166.    Prior to and after delivery of MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION, Rolls Royce and Alstom directly, and through their subsidiaries in Florida acting as their agents had duties to test, inspect, repair and service the Mermaid in numerous instances, including, among others, as set forth hereinabove.

167.    Rolls Royce and Alstom breached their duties to Royal Caribbean by failing to test, inspect, repair and service the Mermaid pods in the numerous instances as set forth above.

168.    As a direct and proximate cause of Rolls Royce and Alstom's negligent testing, inspecting, repairing and/or servicing, Royal Caribbean has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies. Accordingly, Royal Caribbean is entitled to require the Defendants to replace the

Mermaids with properly functioning units, or to pay all costs of doing so.  Additionally, Royal

Caribbean has suffered substantial damages caused by the negligence of Rolls Royce and Alstom,

including but not limited to, consequential and incidental damages.

## Count IX

### Breach of Warranty of Workmanlike Performance Against Rolls Royce and Alstom

169.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as

if fully set forth herein.

170.    As a separate cause of action under the general maritime law, Royal Caribbean avers

that Rolls Royce and Alstom, directly and through their subsidiaries in Florida, which acted as their

agents, breached their warranties of workmanlike performance for failure to perform inspections and

repairs of the Mermaids aboard MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION in

a workmanlike manner.

171.    Prior to and after delivery of the MILLENNIUM, INFINITY, SUMMIT and

CONSTELLATION, Rolls Royce and Alstom held themselves out as competent and able to inspect,

diagnose and repair problems with operation and performance of the Mermaids, but have repeatedly

failed to do so in numerous instances, including, among others, as set forth hereinabove.

172.    As a direct and proximate result of Rolls Royce and Alstom's breach of the warranty

of workmanlike performance, Royal Caribbean has paid millions of dollars for pod propulsion

systems that do not function properly, and the Defendants have been unable to correct the

deficiencies.  Accordingly, Royal Caribbean is entitled to require the Defendants to replace the

Mermaids with properly functioning units, or to pay all costs of doing so.  Additionally, as a direct

and proximate result of Defendants' breach, Royal Caribbean has suffered substantial damages, including but not limited to, consequential and incidental damages.

### Count X

### Negligent Professional Services Against Rolls Royce and Alstom

173.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

174.    In the course of their business, Rolls Royce and Alstom supply cruise ship operators, such as Royal Caribbean, with their professional advice and services regarding the operation and maintenance of the Mermaid and the dry docking requirements of the Mermaid. Rolls Royce and Alstom provide their professional skills and services for the design, construction, servicing, maintaining, testing and repairing of the Mermaids on these cruise ships.

175.    Rolls Royce and Alstom have had, at all material times, a duty of reasonable care to Royal Caribbean to provide professional services, in accordance with the standard of care used by similar professionals in the community under similar circumstances, concerning the reliability and operational efficiency of the Mermaid, which include, but are not limited to, designing, constructing, servicing, maintaining, testing and repairing of the Mermaids on the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION.

176.    Rolls Royce and Alstom employ and/or retain engineers, architects and other professionals in the field of naval engineering and architecture, and  hold themselves out as competent and able to design, construct, test, inspect, diagnose and repair problems with operation

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 56

and performance of the Mermaids, but have failed to do so in numerous instances, including, among others, as set forth above.

177.    Prior to and after the delivery of the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION, Rolls Royce and Alstom, directly and through their subsidiaries in Florida acting as their agents, designed, constructed, serviced, maintained, tested and repaired for Royal Caribbean the Mermaids on these cruise ships.    The design, construction, servicing, maintenance, tests and repairs of the Mermaids on the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION were performed by and through Rolls Royce and Alstom's employees, agents and representatives.

178.    These Defendants, through their employees, agents and representatives, breached their duty to Royal Caribbean by failing to provide reasonable professional services in the design, construction, testing, inspection, diagnosis and repairing problems with the operation and performance of the Mermaids.  The Mermaids have failed to perform their intended purpose as they were improperly designed, constructed, serviced, maintained, tested and repaired.

179.    As a direct and proximate result of Rolls Royce and Alstom's negligent professional services, Royal Caribbean has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Accordingly, Royal Caribbean is entitled to require the Defendants to replace the Mermaids with properly functioning units, or to pay all costs of doing so.  Additionally, Royal Caribbean has suffered substantial damages, including but not limited to, incidental and consequential damages.

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 57

## Count XI

### False, Misleading and Deceptive Advertising
### and Sales by Rolls Royce and Alstom

180.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

181.    Rolls Royce and Alstom's actions in advertising, marketing, promoting, providing, distributing, and selling the Mermaid to Royal Caribbean constitute "misleading advertising" under section 817.40(5) of the Florida Statutes.

182.    For several years, until Rolls Royce and Alstom finally induced Royal Caribbean to select the Mermaid for the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION, Rolls Royce and Alstom in their advertising, marketing, promoting, and selling the Mermaid, made numerous false representations in Florida of material fact regarding the quality, reliability and cost-efficiency of the Mermaid.

183.    Rolls Royce and Alstom knew or should have known that these representations were false at the time they made them.

184.    Royal Caribbean reasonably and justifiably relied on the misrepresentations to its detriment. But for Rolls Royce and Alstom's misrepresentations, Royal Caribbean would not have selected the Mermaid for installation on the MILLENNIUM, INFINITY, SUMMIT and CONSTELLATION.

185.    As a direct and proximate result of Rolls Royce and Alstom's unlawful practices in violation of section 817.41(1) of the Florida Statutes, Royal Caribbean has incurred substantial damages.

186.    As a direct and proximate result of Rolls Royce and Alstom's false, misleading and deceptive advertising and sales, Royal Caribbean has paid millions of dollars for pod propulsion systems that do not function properly, and the Defendants have been unable to correct the deficiencies.  Pursuant to section 817.41(6) of the Florida Statutes, Royal Caribbean is entitled to recover reasonable attorneys' fees, costs, and actual damages.

<u>Count XII</u>

**Tortious Interference with Business Relationships by Rolls Royce and Alstom**

187.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

188.    Prior to the Mermaid failures, Royal Caribbean established and maintained numerous advantageous business relationships with travel agents throughout the world.

189.    Rolls Royce and Alstom knew that these relationships existed.

190.    Rolls Royce and Alstom intentionally and unjustifiably interfered with Royal Caribbean's established business relationships with travel agents throughout the world.

191.    As a direct and proximate result of Defendants' tortious interference with Royal Caribbean's advantageous business relationships, Royal Caribbean has in fact suffered substantial damages, including but not limited to, consequential and incidental damages.

## Count XIII

### Civil Conspiracy Against Rolls Royce and Alstom

192.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 115 above as if fully set forth herein.

193.    Rolls Royce and Alstom entered into an agreement to defraud and deceive Royal Caribbean as to the design, development, testing, deployment, quality, performance, reliability, cost-efficiency, and operational benefits of the Mermaid.

194.    Rolls Royce and Alstom additionally entered into an agreement to defraud and deceive Royal Caribbean regarding their ability to make the defective Mermaid function as represented.

195.    Rolls Royce and Alstom additionally entered into an agreement to defraud and deceive Royal Caribbean by refusing to disclose to Royal Caribbean the true nature of the design and manufacturing defects from which the Mermaid suffered.

196.    Rolls Royce and Alstom engaged in tortious acts in furtherance of the above agreements.

197.    Rolls Royce and Alstom conducted overt acts in furtherance of the tortious agreements into which they entered by actively defrauding and deceiving Royal Caribbean on numerous instances as set forth in the general allegations and counts above.

*Royal Caribbean, et al. v. Rolls Royce PLC, et al.*
Page 60

198.    The overt acts taken by Rolls Royce and Alstom in the furtherance of the tortious conspiracies described herein were the direct and proximate cause of substantial damages to Royal Caribbean, including but not limited to, consequential and incidental damages.


### Demand for Jury Trial

Plaintiffs hereby demand a trial by jury in this action.

**WHEREFORE,** Plaintiffs seek:

1.   A finding of liability as to each of the Defendants for the causes of action alleged in this Complaint;

2.   An Order from this Court directing the Defendants to replace the defective Mermaids with pods that function properly, or to pay the cost of doing so;

3.   An award of actual and consequential damages;

4.   An award of damages for injury to the Plaintiffs' goodwill and reputation;

5.   An award of damages to compensate Plaintiffs for loss of past and future profits;

6.   An award of attorneys' fees and costs pursuant to Fla. Stat. §§501.211, 501.2105, and 817.41(6); and

*Royal Caribbean, et al.  v. Rolls Royce PLC, et al.*
Page 61

7. Pre and post-judgment interest.

Dated: 8/7/03

Respectfully submitted,

GARY E. DAVIDSON, ESQ.
Florida Bar No.: 69094
CARLOS O. FERNANDEZ, ESQ.
Florida Bar No.: 065277
FOWLER, RODRIGUEZ, KINGSMILL,
FLINT, GRAY & CHALOS, L.L.P.
Gables International Plaza
2655 LeJeune Road, Suite 805
Coral Gables, Florida 33134
Telephone: (305) 445-2930
Facsimile: (305) 445-2450
Counsel for:
ROYAL CARIBBEAN CRUISES LTD.;
CELEBRITY CRUISES INC.;
MILLENNIUM INC.; INFINITY INC.;
SUMMIT INC.; and CONSTELLATION INC.



Mermaid™ - Propulsion Principle

Rolls-Royce

EXHIBIT

"1"



The Mermaid™ Components

Rolls-Royce

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
IN AND FOR MIAMI-DADE COUNTY, FLORIDA

ROYAL CARIBBEAN CRUISES LTD;
CELEBRITY CRUISES, INC., MILLENNIUM
INC., INFINITY, INC., SUMMIT, INC., and
CONSTELLATION, INC.,

Case No: 03-18350 CA 02

Plaintiffs

vs

ROLLS ROYCE, PLC; ROLLS ROYCE
NORTH AMERICAN HOLDINGS, INC.;
ROLLS ROYCE COMMERCIAL MARINE,
INC.; ROLLS ROYCE, AB;
ALSTOM POWER CONVERSION, S.A.;
ALSTOM, INC.; ALSTOM POWER
CONVERSION, INC.; MARINE SERVICE
PARTNERS, INC.; and ALSTOM MARINE
US,

Defendants.

_____/

### ORDER DENYING PLAINTIFF'S ROYAL CARIBBEAN CRUISES LTD.'S MOTION TO COMPEL RESPONSES TO REQUESTS FOR PRODUCTION FROM THE ROLLS-ROYCE DEFENDANTS

THIS CAUSE came on to be heard at a duly noticed November 6, 2003 hearing on the Plaintiffs Royal Caribbean's Motion to Compel Responses to Requests for Production of Documents and the Court, having reviewed the file, having heard argument, and being otherwise familiar with this cause,

### ORDERS AND ADJUDGES:

1.   Plaintiff's Motion to Compel is **DENIED**;

{M2035464;1}

Case No. 03-18350 CA 02

2.      The Rolls-Royce Defendants, in accordance with their previous agreement with Plaintiffs, shall file their responses to the Complaint on or before December 8, 2003;

3.      Following the filing of such responses, this Court shall, upon request, consider matters pertaining to the Plaintiff's Requests for Production served upon the Rolls-Royce Defendants.

**DONE AND ORDERED** in Chambers in Miami, Miami-Dade County, Florida this ___ day of November, 2003.

 

Ronald M. Friedman
Circuit Court Judge

Conformed copies to:
Stanley H. Wakshlag, Esq.
Gary E. Davidson, Esq.

IN THE CIRC__ __ COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

ROYAL CARIBBEAN CRUISES LTD;
CELEBRITY CRUISES INC.; MILLENNIUM
INC.; INFINITY INC.; SUMMIT INC.; and
CONSTELLATION INC.

     Plaintiffs,

vs.

ROLLS ROYCE, PLC; ROLLS ROYCE
NORTH AMERICAN HOLDINGS, INC.;
ROLLS ROYCE COMMERCIAL MARINE,
INC.; ROLLS ROYCE, AB
ALSTOM POWER CONVERSION, S.A.;
ALSTOM, INC.; ALSTOM POWER
CONVERSION, INC.; MARINE SERVICE
PARTNERS, INC.;ALSTOM MARINE US;

     Defendants.
_____/

GENERAL JURISDICTION DIVISION
CASE NO.:  03-18350 CA 02

## AGREED ORDER GRANTING PLAINTIFFS' VERIFIED AMENDED MOTION TO ALLOW ANTONIO J. RODRIGUEZ TO APPEAR *PRO HAC VICE*

THIS CAUSE came before the Court on Plaintiffs' Verified Amended Motion to Allow

Antonio J. Rodriguez to Appear *Pro Hac Vice*, having heard argument of counsel, upon agreement of

counsel, and having been fully advised in the premises, it is hereupon

ORDERED AND ADJUDGED that Plaintiffs' Verified Amended Motion to Allow Antonio

J. Rodriguez to Appear *Pro Hac Vice* in this matter is GRANTED.  Mr. Rodriguez, of the law firm

of FOWLER, RODRIGUEZ, KINGSMILL, FLINT, GRAY & CHALOS, LLP, is hereby allowed to

appear *pro hac vice* on behalf of the Plaintiffs in this matter.

DONE AND ORDERED in Chambers in Miami-Dade County, Florida, this _12_ day of

November, 2003.

HONORABLE RONALD M. FRIEDMAN
CIRCUIT COURT JUDGE

Copies furnished to:
All counsel of record

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT, IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

ROYAL CARIBBEAN CRUISES LTD;
CELEBRITY CRUISES INC.; MILLENNIUM
INC.; INFINITY INC.; SUMMIT INC.; and
CONSTELLATION INC.

GENERAL JURISDICTION DIVISION
CASE NO.: 03-18350 CA 02

  Plaintiffs,

vs.

ROLLS ROYCE, PLC; ROLLS ROYCE
NORTH AMERICAN HOLDINGS, INC.;
ROLLS ROYCE COMMERCIAL MARINE,
INC.; ROLLS ROYCE, AB
ALSTOM POWER CONVERSION, S.A.;
ALSTOM, INC.; ALSTOM POWER
CONVERSION, INC.; MARINE SERVICE
PARTNERS, INC.;ALSTOM MARINE US;

  Defendants.

_____/



## AGREED ORDER GRANTING PLAINTIFFS' VERIFIED AMENDED MOTION TO ALLOW MARY C. HUBBARD TO APPEAR *PRO HAC VICE*

THIS CAUSE came before the Court on Plaintiffs' Verified Amended Motion to Allow Mary

C. Hubbard to Appear *Pro Hac Vice*, having heard argument of counsel, upon agreement of counsel,

and having been fully advised in the premises, it is hereupon

ORDERED AND ADJUDGED that Plaintiffs' Verified Amended Motion to Allow Mary C.

Hubbard to Appear *Pro Hac Vice* in this matter is GRANTED. Ms. Hubbard, of the law firm of

FOWLER, RODRIGUEZ, KINGSMILL, FLINT, GRAY & CHALOS, LLP, is hereby allowed to

appear *pro hac vice* on behalf of the Plaintiffs in this matter.

DONE AND ORDERED in Chambers in Miami-Dade County, Florida, this _12_ day of

November, 2003.

_____

HONORABLE RONALD M. FRIEDMAN
CIRCUIT COURT JUDGE

Copies furnished to:
All counsel of record

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE SIDE OF THE FORM.)

## I(a) PLAINTIFFS

ROYAL CARIBBEAN CRUISES LTD.,
CELEBRITY CRUISES INC.,
MILLENNIUM INC., INFINITY INC.,
SUMMIT INC., CONSTELLATION, INC.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)
N/A

Docket:03CV23223JALLAMS

## DEFENDANTS

ROLLS-ROYCE PLC, ROLLS-ROYCE NORTH AMERICAN HOLDINGS INC., ROLLS-ROYCE COMMERCIAL MARINE INC., ROLLS-ROYCE AB, ALSTOM POWER CONVERSION S.A., ALSTOM, INC., ALSTOM POWER CONVERSION, INC., MARINE SERVICE PARTNERS, INC., and ALSTOM MARINE US

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
Miami-Dade County

03 - 23223
CIV-LENARD
MAGISTRATE JUDGE
SIMONTON

## (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Gary E. Davidson, Esq. and
Carlos O. Fernandez, Esq.
Fowler, Rodriguez, Kingsmill, et al.
Gables International Plaza
2655 LeJeune Road – Suite 805
Coral Gables, FL 33134
Telephone No. (305) 445-2930
Facsimile No. (305) 445-2450

## ATTORNEYS (IF KNOWN)

Stanley H. Wakshlag, Anthony J. Cuva
Christopher S. Carver
AKERMAN SENTERFITT
One S.E. 3rd Ave., - 28th Flr.
Miami, FL 33131
Telephone No. (305) 374-5600
Facsimile No. (305) 374-5095

Nicholas Swerdloff & Lisa M. Pisciotta
HUGHES HUBBARD & REED LLP
201 South Biscayne Blvd., 25th Floor
Miami, FL 33131
Telephone No. (305) 373-5670
Facsimile No. (305) 371-8759

### (d) CIRCLE COUNTY WHERE ACTION AROSE:
MIAMI-DADE COUNTY

## II. BASIS OF JURISDICTION
(PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☑ 3. Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)

(FOR DIVERSITY CASE ONLY)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION
**Notice of Removal**
**IVa. 3 days estimated (for both sides) to try entire case**

## V. NATURE OF SUIT (PLACE AN X IN ONE BOX ONLY)

| A CONTRACT | A TORTS | B. FORFEITURE PENALTY | A BANKRUPTCY | A OTHER STATUS |
|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 U S C 158 | ☐ 400 States Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 U S C 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 U S C 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 630 Liquor Laws | A PROPERTY RIGHTS | ☐ 450 Commerce/CC Rates/etc B |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs | ☐ 739 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) B | ☐ 345 Marine Product Liability | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits B | ☐ 350 Motor Vehicle | ☐ 690 Other | B. SOCIAL SECURITY | ☐ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholder's Suits | ☐ 355 Motor Vehicle Product Liability | | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 U S C 3410 |
| ☑ 190 Other Contract | ☐ 360 Other Personal Injury | A LABOR | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 710 Fair Labor Standards Act | ☐ 863 DWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| | ☐ 362 Personal Injury-Med Malpractice | ☐ 720 Labor/Management Relations B | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| | ☐ 365 Personal Injury- Product Liability | ☐ 730 Labor/ Management Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| | ☐ 368 Asbestos Personal Injury PERSONAL PROPERTY | ☐ 740 Railway Labor Act | | ☐ 895 Freedom of Information Act |
| | ☐ 370 Other Fraud | ☐ 790 Other Labor Litigation | A FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| | ☐ 371 Truth in Lending B | ☐ 791 Employee Ret Inc Security Act B | ☐ 870 Taxes (U S Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| | ☐ 380 Other Personal Property Damage | | ☐ 871 IRS - Third Party 26 U S C 7609 | ☐ 890 Other Statutory Actions* |
| | ☐ 385 Property Damage Product Liability | | | & A or B |

| A REAL PROPERTY | A CIVIL RIGHTS | B PRISONER PETITIONS |
|---|---|---|
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ Motions to Vacate Sentence Habeas Corpus |
| ☐ 220 Foreclosure B | ☐ 442 Employment | ☐ 530 General |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus and Other* |
| ☐ 245 Tort Product Liability | ☐ Other Civil Rights | ☐ 550 Civil Rights |
| ☐ 290 All Other Real Property | | * A or B |

## VI. ORIGIN (PLACE AN X IN ONE BOX ONLY)

☐ Original Proceeding  ☑ Removed from State Court  ☐ Remanded from Appellate Court  ☐ Refiled  ☐ Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT
CHECK IF THIS IS A ☐ UNDER F R C P 23

**CLASS ACTION DEMAND**

**JURY DEMAND** ☑ Yes ☐ No

CHECK YES only if demanded in complaint

## VIII. RELATED CASE(S) IF ANY
*Rolls-Royce plc v. Royal Caribbean Cruises, Ltd.*, Case No. 03-23214 CIV-LENARD/SIMONTON
(See instructions)

**DATE** December 5, 2003

SIGNATURE OF ATTORNEY OF RECORD

$150.00  893024

12/05/03

UNITED STATES DISTRICT COURT

FOR OFFICE USE ONLY  Receipt No

{M2042638;2}